**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0794n.06

**No. 10-1285**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jul 23, 2012*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| NATHAN PAUL WESTBERG, | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| CARMEN PALMER, Warden, | ) | |
| | ) | O P I N I O N |
| Respondent-Appellee. | ) | |

---

**BEFORE:    COLE and McKEAGUE, Circuit Judges; and ZATKOFF, District Judge.** *

**ZATKOFF, District Judge.**  Petitioner Nathan Westberg appeals the United States District

Court of the Western District of Michigan's ("District Court") denial of his petition for writ of

habeas corpus.  Westberg raises two issues on appeal: (1) whether the prosecutor's reference to

Westberg's post-*Miranda* silence at trial violated *Doyle v. Ohio*, 426 U.S. 610 (1976); and

(2) whether the sentencing of Westberg violated *Blakely v. Washington*, 542 U.S. 296 (2004).

I.

*A.    FACTUAL BACKGROUND*

In May 2003, Westberg was found guilty by a jury for armed robbery, breaking and entering

a building with intent to commit larceny, and conspiracy to commit breaking and entering.  He was

---

*The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District
of Michigan, sitting by designation.

sentenced to concurrent prison terms of 15 to 40 years on the armed robbery count, 6 to 10 years on the breaking and entering count, and 6 to 10 years on the conspiracy count. Westberg's conviction and sentence arose from his involvement in breaking and entering into a building on Grand Valley State University's campus ("GVSU") on Monday morning, August 26, 2002, stealing approximately $450 and hitting Michael Jenkins. Jenkins, a computer operator at GVSU, testified that while working in the early morning hours on August 26, 2002, he heard glass break around 4:00 a.m. Upon further investigation, he encountered two intruders wearing masks. Jenkins was hit by one intruder with a flashlight and hit by a second intruder with a crowbar. He was unable to identify the intruders but believed them to be two caucasian college-aged males.

Roger Williams, Joshua Powell, and Ernesto Soto—three individuals who were also involved in the planning or commission of the robbery—testified before the jury.

Williams testified on behalf of the prosecution in exchange for a promise that he would not be charged as an accessory to robbery. Williams testified that he planned the robbery at GVSU based on his knowledge that large sums of money were kept in the telephone office where his fiancée had worked. He discussed the plan with Powell and Westberg. According to Williams, however, in late June or early July he told Powell that he was no longer participating. Williams testified that he never discussed the robbery again until he received two phone calls from Powell on August 26, 2002. Powell asked Williams to meet him at a Big Boy near GVSU; Williams agreed. While Williams and Westberg were in the Big Boy, Westberg told Williams that he and Powell had broken a window to enter the building at GVSU, and he had hit a man once inside. Westberg also told Williams that they stole about $500. Powell asked Williams to discard a bundle of clothes and a pair

of boots. Williams took the bundle of clothes, which contained a flashlight, and threw it out of a second floor window of a building into an overgrown area. Williams later put the boots out for the garbage collector.

After Williams was interviewed by the police, Officer Brandon DeHaan was able to recover the clothes and the flashlight. Officer DeHaan retrieved two pairs of pants, two sets of gloves and two masks. In the pockets of one of the pair of pants, Officer DeHaan located a bus pass holder with the phone number 394-1000, a bus pass dated January 2 through May 31, 2001, and a glass cutter. The back of the bus pass contained Westberg's name and signature. The second pair of pants contained nothing.

Based on Powell's involvement in the robbery, he pleaded guilty to armed robbery and breaking and entering. In pleading guilty, a conspiracy charged was dropped. While there was no agreement for Powell to plead guilty to these charges in exchange for his testimony, the prosecutor expressed interest in assisting Powell's counsel regarding an appeal of his sentencing guideline. According to Powell's testimony at trial, he and Westberg decided to go ahead with the plan even though Williams had backed out. Powell testified that they purchased walkie-talkies, a police scanner, a book on the radio frequencies used by police dispatch, masks, and a glass cutter. Westberg and Powell then drove to Chicago, Illinois, on Saturday, August 24, 2002.

Powell further testified that, after picking up Westberg's friend, ErnestoSoto, all three drove back to Michigan to break into GVSU and steal money from an office. According to Powell, Soto acted as a lookout during the robbery, while Powell and Westberg broke into GVSU and stole money. Once inside, they struggled with Jenkins. Eventually, Powell located the money, and Powell

and Westberg left the building and hid in a ravine for several hours. Powell provided similar testimony to that of Williams regarding the meeting with Williams at Big Boy and the request to dispose of some clothes they used during the robbery. Powell turned himself in on September 4, 2002.

Soto testified at trial that he assisted Westberg and Powell in carrying out the robbery. In exchange for his testimony, Soto pleaded guilty to breaking and entering, as opposed to conspiracy to commit breaking and entering. While driving from Chicago to GVSU, Soto was given a police scanner and a two-way walkie-talkie. Soto was told to use the police scanner and walkie-talkie to notify Westberg and Powell if any radio transmissions concerned a crime occurring at GVSU. Soto testified that Westberg and Powell put on masks and gloves and placed a flashlight in a green backpack, which Westberg took with him. Eventually, Soto was apprehended by the police in some brush. Following his arrest, Soto was interviewed by Detective John Lyman. Soto admitted to being involved in the robbery and provided the names of Powell and Westberg.

Amanda Souder also testified for the prosecution. She had met Powell through Williams. She testified that on Friday, August 23, 2002, she went shopping with Powell and Westberg. While shopping, Westberg bought walkie-talkies, masks for paint ball, and a glass cutter. During the purchase of the masks, Westberg tried on one of the masks in the store. The following day, Souder testified that she and Powell went to Radio Shack and purchased a book on police frequencies.

The prosecutor also presented DNA evidence received from the two masks. As to one of the masks, DNA results were inconclusive. As to the second mask, major and minor DNA profiles were found. The major DNA profile implicated Powell, and the minor DNA profile implicated Westberg.

Finally, Officer Richard Horwood of the City of East Lansing Police Department testified that he arrested Westberg on August 28, 2002, in East Lansing.

After the prosecution rested, the defense called Westberg and Damon Lee, a friend of Westberg since childhood. Lee testified that Westberg and he were in Chicago at Lee's house during the time of the robbery. Lee testified that Westberg and a man named "Josh" (referring to Powell) came to his house for Harvest Festival on the Sunday night before Lee started school. All three drank alcohol with other friends of Lee. According to Lee, "Josh" left around 1:00 a.m. on Monday morning and did not return until shortly before 12:00 p.m. Westberg and Powell then left Lee's house.

Westberg denied being involved in the robbery at GVSU on August 26, 2002. Corroborating Lee's testimony, Westberg testified that on the weekend of the robbery, he and Powell drove to Chicago. Once in Chicago, Westberg and Powell went to Lee's house. He remained at Lee's house on Sunday night. According to Westberg, Powell left Lee's house around 12:00 a.m. on Monday, August 26, 2002, without Westberg and then returned later that day around 12:00 p.m. Westberg and Powell then returned to Michigan together. Westberg stated that during the drive back to Michigan, Powell never mentioned being involved in a robbery at GVSU. As to the items that Westberg and Powell purchased, Westberg testified that he purchased the mask and walkie-talkies for paint ball, the police scanner for hearing whether the police would arrive to break up their parties, and the glass cutter to replace a window in his car. Westberg denied that the glass cutter presented at trial was the one he bought.

During the cross-examination of Westberg, the prosecutor made reference to the fact that Westberg only recently mentioned his alibi defense (purportedly two to three weeks before trial) that he was with Lee in Chicago at the time the robbery occurred at GVSU, even though Westberg had been in jail since his arrest awaiting trial. Westberg's defense counsel objected to the line of questioning based on attorney-client privilege. The prosecutor also referenced the recent timing of Westberg's alibi defense in his closing arguments and rebuttal to closing arguments.

B.    PROCEDURAL BACKGROUND

Westberg appealed his conviction and sentence, which was denied by the Michigan Court of Appeals and the Michigan Supreme Court. *People v. Westberg*, No. 250334, 2005 WL 77103 (Mich. Ct. App. Jan. 13, 2005) (unpublished); *People v. Westberg*, 705 N.W. 2d 133 (Mich. 2005) (table opinion). Following Westberg's state-court appeals, Westberg filed a petition for writ of habeas corpus with the District Court. He presented to the District Court the two issues now before us. The District Court denied Westberg's petition, finding that the prosecutor's *Doyle* errors were harmless and that *Blakely* was not applicable to Michigan's indeterminate sentencing scheme. *Westberg v. Palmer*, No. 1:07-CV-82, 2010 WL 432271, at *1, 29 (W.D. Mich. Jan. 27, 2010). Westberg appeals the denial of his habeas corpus petition.

II.

In a habeas corpus appeal, we review the District Court's legal conclusions *de novo* and its factual findings for clear error. *Boykin v. Webb*, 541 F.3d 638, 642 (6th Cir. 2008). The state-courts' determinations, however, are reviewed under the standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that a federal court may not grant a writ

of habeas corpus to a petitioner on any claim adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "[A] federal constitutional claim reviewed by a state court for 'plain error' can be considered 'adjudicated on the merits' for the purpose of receiving deference under AEDPA." *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

III.

A.    DOYLE *ERROR*

*1.    Procedural Default*

Respondent contends that Westberg's *Doyle* claim is procedurally defaulted because Westberg's trial counsel failed to object at trial, and Westberg cannot show the necessary cause and prejudice to excuse the procedural default. In response, Westberg argues that his claim is excused from being procedurally defaulted due to the ineffective assistance of counsel at trial.

We need not consider whether Westberg's claims are procedurally defaulted before turning to the merits of his claims. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, . . . if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.")); *cf.* 28 U.S.C. § 2254(b)(2) (stating that a writ of habeas corpus may be denied on the merits, notwithstanding the petitioner's failure to exhaust all state-court remedies). Because the procedural default analysis adds unnecessary complexity to our analysis, we proceed to the merits of this appeal. *See Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010).

*2.    Harmless Error*

Westberg argues that the prosecution violated his due process rights as set forth in *Doyle*.[1]

In *Doyle*, the Supreme Court explained that "it would be fundamentally unfair and a deprivation of

---

[1]In reviewing the record, it is unclear from the testimony when Westberg was advised of his *Miranda* rights. Even so, neither Westberg nor Respondent contests this fact on appeal, and thus for purposes of our analysis of Westberg's *Doyle* claim, we assume that Westberg received his *Miranda* rights at the time of arrest as Westberg states in his petition.

due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618. The Supreme Court held that the "use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619; *see Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (explaining that *Doyle* prohibits a prosecutor from using a criminal defendant's silence, maintained after receipt of *Miranda* warnings, to impeach that defendant). In subsequent decisions, the Supreme Court reinforced *Doyle*, making it clear that a prosecutor's reference at trial to a defendant's silence during the time between receiving his *Miranda* warnings and going to trial violated *Doyle*. *See Wainright*, 474 U.S. at 291; *Greer v. Miller*, 483 U.S. 756, 762 (1987); *Brecht v. Abrahamson*, 507 U.S. 619, 628-29 (1993).

The Michigan Court of Appeals, applying plain error review, found that the prosecutor's references to Westberg's post-*Miranda* silence "constituted fair comments on the evidence presented" and, because Westberg testified at trial, did not violate his Fifth Amendment right against self-incrimination.[2] *Westberg*, 2005 WL 77103, at *3. The District Court determined that the Michigan Court of Appeals failed to apply the applicable Supreme Court precedent and found its conclusion contrary to *Doyle*. Instead, the District Court found that the prosecutor's references to Westberg's silence violated *Doyle*. Examining the trial record, the District Court then decided whether the prosecutor's violation of *Doyle* was harmless error. *See Brecht*, 507 U.S. at 629, 637.

---

[2]Westberg does not raise a violation of his Fifth Amendment right against self-incrimination in his initial brief, and thus the issue is waived on appeal. *Guilmette v. Howes*, 624 F.3d 286, 292 (6th Cir. 2010) (en banc).

Denying Westberg habeas relief, the District Court concluded that the evidence against him was so strong that the *Doyle* violations were harmless.

Assuming *Doyle* error occurred, we review the record *de novo* and consider whether the error was harmless. The harmless error standard focuses on whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. "Under this standard, habeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* The weight of the evidence presented at trial showing the defendant's guilt and the number of references made by the prosecutor regarding the defendant's post-*Miranda* silence are relevant. *Id.* at 639.

In light of the overwhelming evidence of guilt, we find that the prosecutor's reference to Westberg's post-*Miranda* silence had no "substantial and injurious effect or influence in determining the jury's verdict." While Westberg is right to point out that his three accomplices were all provided some benefit in exchange for their testimonies, there is no evidence to show, or even suggest, that they fabricated their testimonies. The testimonies of Williams, Soto, and Powell were consistent with one another. Their testimonies established that Westberg had carried out the robbery at GVSU with Powell and Soto, and Westberg had hit Jenkins. Their testimonies were further supported by the physical evidence and the testimonies of the other prosecution witnesses presented at trial.

Williams testified that Powell had asked him to dispose of clothes that Powell and Westberg used during the robbery. This was corroborated by Powell's testimony and Officer DeHaan's discovery of the clothing in the location where Williams testified he had disposed of them. The clothing included a pair of pants linking Westberg to the crimes, further substantiating Westberg's

involvement in the robbery. Officer DeHaan found a bus pass holder with the phone number 394-1000, a bus pass dated January 2 through May 31, 2001, and a glass cutter in the pair of pants. The back of the bus pass contained Westberg's name and signature.

While disputing that the glass cutter produced at trial was his, Westberg admitted to being involved in the purchase of the instruments used in committing the crimes. Powell also testified that he and Westberg had purchased the walkie-talkies, the police scanner, a book on the radio frequencies used by police dispatch, two masks, and a glass cutter. The purchase of these items was corroborated further by Souder, who was with Powell and Westberg when the items were purchased. The police scanner and a walkie-talkie were found by the police after arresting Soto, who testified that he used them during the robbery at GVSU to inform Westberg and Powell of any relevant information. The jury also heard Soto testify that Westberg and Powell put on the masks before breaking into GVSU. Officer DeHaan testified to the jury that he recovered the two masks in the clothes Williams disposed. DNA analysis presented to the jury showed that there was DNA on one of the masks that was related to a DNA sample taken from Westberg.

When Westberg was arrested, the police seized his backpack as evidence. In the backpack, Detective Lyman recovered a receipt that identified by serial number the police scanner that was recovered after Soto's arrest. Even Westberg testified that the pair of pants presented into evidence were similar to pants he owned. Westberg also identified the backpack, the police scanner, the walkie-talkies and the bus pass.

The only testimony presented to the jury that contradicts the prosecution's evidence was that of Lee and Westberg. For good reasons, however, their testimony was not as strong as Westberg

contends. Lee's testimony supported Westberg's alibi defense that he was not near GVSU during the commission of the robbery. However, the reliability of his testimony was questionable. Lee testified that Westberg came to his house the weekend of the robbery to party for the Harvest Festival. But, as Officer DeHaan testified, the Harvest Festival occurred the following weekend, from August 30 to September 1. The jury also heard Lee testify that he had consumed marijuana and alcohol on the Sunday he was with Westberg.

Westberg's testimony was suspect as well. Westberg's testimony permitted the jury to infer that Powell and Soto committed the robbery without Westberg while Powell was absent from Lee's house. According to Westberg, Powell left Lee's house around 12:00 a.m. on Monday, August 26, 2002, without Westberg, and then returned later that day around 12:00 p.m. Westberg's testimony created the inference that, during this 12 hour period, Powell was able to pick up Soto, drive from Lee's house (located in Hanover Park, a Northwest suburb of Chicago) to GVSU's campus in Grand Rapids, steal approximately $450, and then return to Lee's house to pick up Westberg. Westberg's testimony, however, is difficult for a jury to accept as true given the fact that Jenkins heard glass break in the building at GVSU around 4:00 a.m., and dispatch responded to the building because of 911 calls around 4:30 a.m. From the time Powell left Lee's house, Powell would have had only three hours to arrive at GVSU by approximately 4:00 a.m. when the robbery occurred.[3]

Furthermore, Powell and Westberg were close friends that lived together in East Lansing. During the weekend of the crime at GVSU, they made the round-trip from East Lansing to Lee's

---

[3]Because of the difference in time zones between Chicago and Grand Rapids, Westberg's testimony that Powell left Lee's house at 12:00 a.m. in Chicago is the same as 1:00 a.m. in Grand Rapids. Likewise, the fact that Jenkins testified to hearing glass break around 4:00 a.m. in the building at GVSU is the equivalent of 3:00 a.m. in Chicago.

house together. Their return trip would have occurred shortly after Powell had committed the robbery at GVSU. Yet, according to Westberg's testimony, at no point during the weekend, including the return trip, did Powell mention to Westberg that he intended to steal money from GVSU or was involved in any incident at GVSU.

Moreover, Westberg testified that he and Powell left for Chicago on Friday night, yet the evidence indicated that Powell had purchased the book on police radio frequencies in East Lansing the following day. When the prosecutor asked Westberg how Powell was able to purchase the book in East Lansing on Saturday if Westberg and Powell had left on Friday night, Westberg stated that he may have been mistaken. Due to the inconsistencies of Lee's and Westberg's testimonies and the improbability that Powell committed the robbery while Westberg stayed at Lee's house, we cannot find that the prosecutor's comments on Westberg's failure to come forward with his alibi earlier had a "substantial and injurious effect or influence in determining the jury's verdict." In light of the overwhelming evidence of guilt presented at trial, we conclude—as the District Court did—that the prosecutor's errors were harmless.

B.    SENTENCING VIOLATION

Alternatively, Westberg contends that the Michigan trial judge violated Westberg's Sixth Amendment right to a jury, as explained in *Blakely*, by enhancing his minimum sentence under Michigan's indeterminate sentencing scheme based on facts not determined by the jury or admitted to by Westberg. Westberg, however, concedes the lack of merit in his claim based on this Circuit's holdings in *Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009), and *Montes v. Trombley*, 599 F.3d 490, 497 (6th Cir. 2010). For the same reasons discussed in *Chontos* and *Montes*, the

Michigan Court of Appeals' finding that *Blakely* does not apply to Michigan's indeterminate sentencing scheme was not "contrary to" or an "unreasonable application of" Supreme Court precedent. *See Chontos*, 585 F.3d at 1001–02 (concluding that *Blakely* was inapplicable to a Michigan trial judge's factfinding that established the defendant's *minimum* sentence under Michigan's sentencing guidelines); *Montes*, 599 F.3d at 495 (stating that *Blakely* "is limited by its own terms to judicial factfinding that increases the penalty beyond the maximum permitted by the relevant statute."). Accordingly, we deny Westberg's claim for relief under the Sixth Amendment.

IV.

Accordingly, the District Court's decision is AFFIRMED.