*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0284p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

ANDREW BABICK, JR.,

        *Petitioner-Appellant,*

    *v.*

MARY BERGHUIS, Warden, Brooks
Correctional Facility,

        *Respondent-Appellee.*

No. 08-1376

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 03-00020—Wendell A. Miles, District Judge.

Argued: March 11, 2010

Decided and Filed: September 3, 2010

Before: MERRITT, COOK, and KETHLEDGE, Circuit Judges.

————————————

## COUNSEL

————————————

**ARGUED:** Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand
Rapids, Michigan, for Appellant. Laura Graves Moody, OFFICE OF THE ATTORNEY
GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Paul L. Nelson, FEDERAL
PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan, for Appellant. Laura
Graves Moody, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for
Appellee.

    KETHLEDGE, J., delivered the opinion of the court, in which COOK, J., joined.
MERRITT, J. (pp. 12-19), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

    KETHLEDGE, Circuit Judge. At 2 a.m. on September 9, 1995, a house burned
down in Battle Creek, Michigan, within minutes after Andrew Babick, Jr. left it. Two

1

young boys died in the blaze. A jury in Michigan state court later convicted Babick of one count of arson and two counts of first-degree felony murder. The state trial court sentenced Babick to two terms of life imprisonment without possibility of parole. Babick argues here, as he did in the district court, that his convictions were tainted by ineffective assistance of counsel and prosecutorial misconduct. But Congress has made clear that there are limits to our power to grant habeas relief; and Babick's claims, for the reasons stated below, lie beyond them. We therefore affirm the district court's denial of his petition.

## I.

## A.

Shortly before midnight on September 8, 1995, Babick left his home to buy crack cocaine. He walked to 264 Grove Street, a house where he had bought crack before. LuQuentine Caldwell was on the porch when he arrived. LuQuentine at first denied having any crack, but eventually sold Babick a small rock for $20, which was double its street value. Babick took the rock to his sister's house and smoked it. He then went back to the Grove Street house, where he pounded on the door. The pounding woke Belinda Sutton, who was sleeping in one of the upstairs bedrooms with Lyndon Caldwell. Sutton went downstairs and answered the door. She says that Babick was angry and that he accused LuQuentine of selling him bad crack; but Babick says he simply wanted to buy more crack. In any event, Sutton told Babick that LuQuentine had left the house and that she did not know when he would return. She locked the door and went back to sleep. According to Sutton's trial testimony, it was about 1:30 a.m. then. Babick says he spent the next 20 minutes on the house's front porch, dozing on a sofa and smoking a cigarette. At some point he went home.

At approximately 2 a.m., a smoke alarm woke Sutton and Lyndon. Lyndon tried to reach the other bedroom, where Jacqueline Caldwell's two- and three-year-old sons were sleeping, but was turned back by thick smoke in the hallway. He and Sutton jumped from a rear window and went to a neighbor's house to call for help. The Battle Creek Fire Department received that call at 2:05 a.m. Firefighters arrived about three

minutes later to find the front of the house engulfed in flames. They doused the fire and made their way upstairs, where they found the boys' charred bodies.

At about 3 a.m. that night, Babick tried to return to the scene a third time, but was unable to get there because the street was blocked by emergency vehicles. The following afternoon, police officers went to Babick's house and asked him to come to the station for an interview. He agreed. The officers did not place Babick under arrest, but Detective Timothy Hurtt did inform him of his *Miranda* rights. Hurtt also told him that the interview was being videotaped. Babick answered questions for a while, but invoked his right to counsel and ended the interview after Hurtt accused him of starting the fire.

The police also interviewed the residents of the Grove Street house and several neighbors. Officers walked a canine through the house to sniff for accelerants and took numerous floor and carpet samples for laboratory analysis. They also executed a search warrant at Babick's residence and seized a pair of shoes to which the canine alerted. Meanwhile, the Fire Department brought in an investigator from the Fire Marshal division of the Michigan State Police, in addition to the Department's own investigator.

The police eventually referred the matter to the Calhoun County prosecutor's office. The prosecutor agreed that the fire was arson, but thought there was a lack of evidence that Babick was the person who set it. The Michigan attorney general's office disagreed, however, and charged Babick with arson of a dwelling house and two counts of felony murder.

B.

The trial court appointed Alma Mason-Thurmer to represent Babick. She obtained court orders allowing her to seek reimbursement from the state for the costs of an arson expert and a private investigator. But she hired only the latter; her strategy was to concede that the fire was arson, but to argue that there was insufficient evidence that Babick was the person who set it. Babick's case went to trial before a jury, which found

him guilty on all counts. The court then imposed a mandatory sentence of two terms of life imprisonment without possibility of parole.

Babick twice moved for a new trial after sentencing. The trial court denied both motions. Babick also filed a direct appeal in which he raised six issues. The Michigan Court of Appeals rejected his arguments and affirmed his conviction. *See People v. Babick*, No. 207638, 1999 WL 33437948 (Mich Ct. App. Aug. 13, 1999). Over a dissent, the Michigan Supreme Court denied leave to appeal. *See People v. Babick*, 614 N.W.2d 588 (Mich. 2000). The United States Supreme Court denied his petition for a writ of certiorari. *See Babick v. Michigan*, 531 U.S. 1090 (2001).

Babick next filed a motion in the trial court requesting relief from the judgment. He presented several new claims, including claims of ineffective assistance of trial counsel and prosecutorial misconduct. He also said that his appellate counsel had been ineffective for failing to assert those claims earlier. The trial court denied the motion on claim-preclusion grounds. The Michigan Court of Appeals and the Michigan Supreme Court both denied leave to appeal.

Babick then filed a petition for a writ of habeas corpus in federal district court. Four of his claims are relevant here: First, that his trial counsel was ineffective for failing to consult with an arson expert; second, that his counsel was ineffective for failing to obtain a television schedule for purposes of impeaching Belinda Sutton at trial; third, that the prosecutor committed misconduct by allegedly interfering with Mason-Thurmer's efforts to retain an arson expert; and fourth, that the prosecutor again committed misconduct by commenting, during closing arguments, on Babick's post-*Miranda* request for an attorney.

A magistrate judge concluded that Babick had procedurally defaulted these claims by failing to present them during his direct appeal, but that his appellate counsel's ineffectiveness established cause and prejudice to excuse those defaults. The magistrate then concluded that Babick was entitled to relief on the merits of each claim, and so recommended that the district court grant the writ. The district court rejected that recommendation and denied the petition on the merits. *See Babick v. Berghuis*, No.

1:03-cv-20, 2008 WL 282166 (W.D. Mich. Jan 29, 2008).  The court also denied Babick a certificate of appealability.  He then sought one from this court, which we granted.

This appeal followed.

## II.

We review *de novo* a district court's denial of a habeas petition.  *See Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006).  Babick procedurally defaulted his claims in state court.  To obtain relief on them here, therefore, he must establish cause and prejudice for the defaults.  *See Hargrave-Thomas v. Yukins*, 374 F.3d 383, 387 (6th Cir. 2004).  He must also show that the claims are meritorious.  We cut to the merits here, since the cause-and-prejudice analysis adds nothing but complexity to the case.  *See generally Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003).  So to the merits we now turn.

## III.

### A.

To prevail on his ineffective assistance of counsel claims, Babick must first show that his trial counsel's "representation fell below an objective standard of reasonableness."  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Babick must then establish prejudice, which requires him to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See id.* at 694.

### 1.

Babick argues that his trial counsel's representation was deficient because she should have at least consulted an arson expert before abandoning a not-arson defense at trial.  We evaluate decisions not to investigate "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id.* at 691.

Babick's argument has some force, particularly when considered in isolation. But a reasonably competent lawyer could have concluded that the prosecution's evidence of arson was the strongest part of its case. The state was prepared to produce several witnesses—experienced fire investigators, the commanding firefighter on the scene, and a canine handler—to show the fire was intentionally set. The state's theory, as set forth by two fire experts at trial, was that someone had poured flammable liquid on the front porch and then into the house through the front door and up the staircase. The state would further show that laboratory analysis had confirmed the presence of an accelerant at one of the locations where the dog had alerted—namely, the cement steps leading from the porch into the house. The state was also prepared to show that several common causes of accidental fires could be positively ruled out, since the fire had not affected the kitchen, the basement electrical panel, the furnace, or the water heater.

The evidence that Babick was the arsonist appeared weak by comparison. All of the witnesses who fingered him were admitted crack dealers testifying under immunity. Moreover, the house's owner—herself a crack dealer—had insured the house and was behind on her payments, which arguably gave her a motive to burn it down.

This case is therefore a negative image, rather than a copy, of *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007), upon which Babick principally relies. There, the evidence tying Richey to the fire was nearly insurmountable: The apartment's owner had recently told Richey that she was leaving him for another man; Richey himself had made threats that night that he would "torch the place"; and numerous witnesses placed him in the burned apartment building at the time of the fire. *Id.* at 346-47. A not-arson defense was Richey's only real chance for acquittal, and we faulted his counsel for failing to pursue it. But that does not mean that we must do the same thing here, where the respective strengths of the two defenses—not-arson, and not-arsonist—are reversed.

But the simplest ground on which to decide Babick's claim is prejudice. He has shown none as a result of his trial counsel's failure to produce an arson expert in support of his defense. Indeed, his counsel in this federal habeas case—whom our decisions show to be effective indeed— has made the same omission even now. We do not

attribute that to oversight: Babick's appellate counsel in state court contacted an arson expert in 1998, but that expert refused to offer an opinion on the fire's cause. Babick says that refusal was because most of the evidence had been destroyed by then. Maybe so; but even the internet articles upon which Babick relies make clear that, in different cases with different facts, arson experts have criticized the prosecution's case on a cold record. Babick offers no such criticism here.

What Babick does offer, instead, are three articles, none of them specific to his case. *See* Pet. Supp. Ex. A-C. Two of the articles contain nothing more than general criticism of the arson evidence used to obtain convictions in two Texas cases from the late 1980s and early 1990s. Moreover, both articles were written in 2006 and emphasize the superiority of modern forensic techniques—which of course would not have been available to an expert in 1996. The third article helps Babick even less, given that it is overwhelmingly positive about the use of accelerant-detecting canines and cautions only against relying on a dog's alert as the *sole* indication that an accelerant was used. That caution is irrelevant here, since the alerts were corroborated by several other indications—including two different investigators' analyses of the burn patterns at the scene, and a positive laboratory result. On this record, at least, three generic internet articles are not enough to set aside the final judgment of a state court. There is simply no way for us lawfully to hold that Babick has made the requisite showing of prejudice to prevail on his claim.

There is a coda, however. In response to questioning at oral argument before this court, Babick asked that we remand the case to the district court for an evidentiary hearing regarding his claims. But there are several reasons why we cannot do that either. As an initial matter, Babick did not make any such argument in his brief, so the argument is forfeited. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (en banc).

The argument fails on the merits as well. Babick requested an evidentiary hearing in the district court, albeit as an afterthought in a supplemental brief in support of his petition. The court considered the request and carefully explained its reasons for

denying it. *See Babick*, 2008 WL 282166, at *10-12. We review that denial for an abuse of discretion. *See Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). At the outset, there is a serious question as to whether Babick's request is categorically barred by 28 U.S.C. § 2254(e)(2), which generally prohibits a federal court from holding an evidentiary hearing where the petitioner has not been diligent. *See Williams v. Taylor*, 529 U.S. 420, 432 (2000). But here again the argument fails on simpler grounds: Babick *lacked any witnesses* to put on at the hearing. On this record, we cannot hold that the district court abused its discretion by denying Babick's request for a hearing. *See Getsy v. Mitchell*, 495 F.3d 295, 312 (6th Cir. 2007) (en banc) (affirming the district court's denial of a hearing to explore petitioner's "unsupported speculation"); *Hutchison v. Bell*, 303 F.3d 720, 732 (6th Cir. 2002) (same, where the petitioner "never indicated what evidence he would have presented").

2.

Babick also argues that his trial counsel was ineffective for failing to investigate the basis of Belinda Sutton's testimony regarding the time of Babick's second visit to the house that burned down. Sutton said that Babick arrived at about 1:30 a.m., based on the program on her television when his pounding woke her. But that program actually aired from midnight until 1 a.m., a fact that Babick's trial counsel never uncovered. Had his counsel obtained a television schedule, Babick argues, she could have used it to impeach Sutton's testimony and to put more time between his arrival and the start of the fire.

This failure to investigate was regrettable. Babick's counsel knew from the police report that Sutton's time estimate was based on the program; and she knew from the preliminary hearing—where Sutton had initially said 12:30 a.m. rather than 1:30 a.m.—that Sutton's estimate was shaky. Moreover, distancing Babick from the time of the fire was important to her not-arsonist defense.

But Babick's own statements undermine any showing of prejudice. According to what he told Detective Hurtt, Babick first arrived at the Grove Street house around midnight. He stayed for a few minutes, bought a rock of crack, and then walked one

mile back to his sister's house. That walk, according to Hurtt, takes about 17 minutes. Babick said that he entered his sister's house through a window, spent about an hour there smoking the crack, and then walked back to the Grove Street house. Babick's own statements, then, place him at the Grove Street house at about 1:40 a.m., just 20 minutes before the fire began.

Babick argues that his own time estimates could have been wrong and that his walking speed or route could have differed from Hurtt's. But Babick's initial arrival time was corroborated by five witnesses, so that variable is hardly in play. Moreover, Hurtt took a direct route between the houses, and was sober when he did so—whereas Babick was admittedly "kind of drunk" even before smoking the crack. So we doubt that Babick traveled any faster than Hurtt did. The remaining variable is Babick's time at his sister's house. Unless he spent almost no time there at all, however, he simply could not have returned to the Grove Street house before Sutton's television program ended. So the reasonable conclusion, based upon all of the other evidence in the case, is that Sutton was wrong about the television program, rather than about Babick's arrival time. We see no reasonable probability that the outcome of Babick's trial would have been different had his counsel obtained the television schedule; and that means his claim fails.

## B.

Babick's criticisms are not limited to his own counsel's performance. He also claims that the prosecutor committed misconduct at trial. We turn to those claims.

## 1.

Babick argues that Assistant Attorney General Mark Blumer wrongfully interfered with Mason-Thurmer's efforts to retain an arson expert. After the trial court authorized her to seek reimbursement for the costs of an arson expert and a private investigator, she sent a letter to Blumer's office stating that she would be sending the bills to him. Blumer replied that any such bills would be returned unpaid, that she

instead should seek reimbursement through a state administrative board, and that, if the board denied reimbursement, her only recourse would be to sue the state.

That message, Babick says, violated what he regards as his due-process right to a state-paid expert witness. He assumes that the right recognized in *Ake v. Oklahoma*, 470 U.S. 68, 86-87 (1985)—to a psychiatrist's assistance in support of an insanity defense—extends to non-psychiatric experts as well. But the Supreme Court has treated that question as open. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985). The circuit courts have not reached consensus on the question. *See*, *e.g.*, *Baxter v. Thomas*, 45 F.3d 1501, 1511 n.24 (11th Cir. 1995) (no extension recognized); *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993) (extension recognized, but with additional barriers); *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir. 1987) (en banc) (extension recognized in full). Our own precedent is unclear. *Compare Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993) (per curiam) (stating, without explanation, that a criminal defendant was entitled to a pathologist's assistance) *with Tinsley v. Million*, 399 F.3d 796, 807 (6th Cir. 2005) (questioning a defendant's claimed entitlement to a blood-spatter expert).

But we need not join that debate today. Babick has not shown that the letter had the effect he says it had. The letter did not bar payment of an expert's fees, but referred Mason-Thurmer to another state agency for payment. One might criticize that message on state-law grounds, but not, we think, on federal constitutional ones. Moreover, Mason-Thurmer went on to hire a private investigator and to obtain reimbursement for his services, even though the letter spelled out the same procedure for obtaining reimbursement of those fees as it did for arson-expert fees. On the record, therefore, there is no basis to conclude that the letter had any effect on Mason-Thurmer's decision not to retain an arson expert.

Babick also contends the refusal to pay effectively "deterr[ed] a defense witness from testifying by intimidation or threat." That is facially not true. And neither has Babick shown, as generally discussed above, that the absence of an arson expert rendered his trial fundamentally unfair. *See Darden v. Wainwright*, 477 U.S. 168, 181

(1986) (alleged misconduct must "infect[] the trial with unfairness"). We therefore reject this claim.

2.

Babick argues that the prosecutor engaged in misconduct by commenting on his post-*Miranda* request for an attorney. The request first came to the jury's attention, however, when Babick's trial counsel insisted on playing the unedited videotape of Babick's police interview. Then, during closing argument, the prosecutor said Babick had asked for an attorney only after it became clear that the police did not believe his statements to them. Babick contends that this comment violated his Fourteenth Amendment right to due process, as described in *Doyle v. Ohio*, 426 U.S. 610 (1976).

Under *Doyle*, the government may not first induce a defendant's silence by warning him of his *Miranda* rights and then use his invocation of those rights to impeach him at trial. *See id.* at 618. *Doyle* thereby protects defendants who have relied on the government's assurances that they will not be punished for exercising their *Miranda* rights. *See Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986). But Babick did not rely on any such assurances here; to the contrary, he waived his *Miranda* rights and voluntarily gave a statement. *See Anderson v. Charles*, 447 U.S. 404, 408 (1980) (per curiam) ("[A] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent"). He therefore lacks the predicate for a *Doyle* claim. *See Wainwright*, 474 U.S. at 291 n.6; *accord United States v. Lopez-Lopez*, 282 F.3d 1, 12 (1st Cir. 2002); *United States v. Harris*, 956 F.2d 177, 181 (8th Cir. 1992).

Finally, Babick contends that the prosecutor's comments violated his Fifth Amendment privilege against compelled self-incrimination. *See Griffin v. California*, 380 U.S. 609 (1965). But Babick never made this argument in the district court, so the argument is forfeited. *See Byrd v. Collins*, 209 F.3d 486, 538-39 (6th Cir. 2000).

\*          \*          \*

We have no lawful basis to set aside the state court's judgment in this case. The district court's denial of the petition is affirmed.

———————

**DISSENT**

———————

MERRITT, Circuit Judge, dissenting.  An egregious mistake has been made in this case.  The petitioner, Babick, got convicted of arson on the basis of pure "junk science" in a case the local District Attorney in Battle Creek, Michigan, refused even to bring[1] and Magistrate Judge Ellen Carmody below would have reversed in a writ of habeas corpus.  District Judge Wendell Miles reversed Judge Carmody, and we now have before us this strange junk science case brought for undisclosed reasons by an Assistant Attorney General of the State instead of the local District Attorney.  I agree with the local D.A. and Judge Carmody that the case should never have been prosecuted. The evidence of arson is based on expert testimony inconsistent with the clear standards set out in the bible of arson forensic science, The NFPA (National Fire Protection Association) 921, *Guide for Fire and Explosion Investigations* 921 (2004 and 1995 eds.). The case has gotten this far through a combination of the state's refusal to provide the defense with an arson expert, and defense counsel's failure to understand fully and explain persuasively the need for such an expert, and the consequent failure of judges and jurors along the way to recognize that the scientific evidence on which the jury based its verdict is bogus.

As perhaps the worst example of the junk science nature of the case, take the dog-sniff evidence offered by "expert" witness Jeff Austin, who told the jury that his dog, Samantha, was "1000 times" more effective at detecting fire starters or liquid accelerants than a laboratory test on burnt material.  The lab testing of the materials from the house had not found accelerants in the house and Samantha's dog-sniff evidence was then used to rehabilitate or contradict the negative lab tests.  The jury was misled into trusting Samantha over the arson forensic lab.  The authoritative Fire Guide is unequivocal that canine evidence requires lab corroboration in order to be considered reliable.  "Research has shown that canines have been alerted to pyrolysis products that

———————

[1] See Appendix 1, the letter of the local District Attorney declining to prosecute the case.

are not produced by an ignitable liquid," and a positive alert by a canine that is not confirmed by a forensic lab "should not be considered validated." Fire Guide § 16.5.4.7 (describing the role of canine investigation as "assisting with the location and collection of samples" for laboratory testing.) The evidence is so unreliable that, in a recent case, the federal judge even granted a Defendant's motion *in limini* to prohibit expert testimony of a canine handler because the alert had not been confirmed by lab testing and hence conflicted with the Fire Guide and did not meet the *Daubert* standards for relevancy and reliability. *United States v. Myers*, No. 3:10-00039, 2010 WL 2723196 (S.D.W.Va. July 8, 2010).

The remainder of the evidence used to convict Babick is expert testimony of a similar nature that the national standards condemn as unreliable. Fire expert Wayne Etue told the jury that char marks on the porch were evidence of an accelerant, that a "line of demarcation" burn pattern on a carpet was "suspicious" because "it should not have burned the carpeting on these jagged edges," and repeated that the burns were "not normal" and were "unnatural." (R. 17, Trial Transcript, Volume 1, at 209, 215, 217-18, 219). Fire expert Joan Tuttle also told the jury that "low burning" and that other "unnatural" patterns indicated the presence of accelerant. Both Etue and Tuttle testified – in direct contrast to the NFPA guide – that they were so confident in their reading of burn patterns that the absence of any laboratory confirmation of accelerant had no effect on their testimony. (R. 18, Trial Transcript Volume 2, at 38, 53).

Chapter 22 of the National Guide sets out the standards for determining whether a fire was an incendiary fire, defined as "a fire that has been deliberately ignited under circumstances in which the person knows the fire should not be ignited." Fire Guide at § 22.1. The interpretation of burn patterns is too subjective to stand unless corroborated by laboratory testing. While "irregular patterns" may indicate the presence of an ignitable liquid, "[t]he investigator should ensure that samples are taken from any area where ignitable liquids are suspected to be present" and confirmed by lab testing. Fire Guide at § 22.2.7.2. The guide also addresses burn patterns called "trailers" that may be visible connecting separate fire sets, again stating that "samples of possible liquid

accelerants should be collected and analyzed." *Id.* § 22.2.2. The guide instructs investigators not to draw conclusions from irregular burn patterns: "Irregularly shaped objects on the floor . . . may provide protection to the floor, resulting in patterns that may be inaccurately interpreted." § 22.2.2.3. The guide offers a strongly-worded warning to investigators:

> Investigators may form an opinion that the speed of fire growth or the extent of damage was greater than would be expected for "normal" fuels . . . However these opinions are subjective. . . . What an investigator may consider as "excessive," "unnatural," or "abnormal" can actually occur in an accidental fire, depending on the geometry of the space, the fuel characteristics, and the ventilation of the compartment . . . . The investigator is strongly cautioned against using subjective opinions to support an incendiary cause determination in the absence of physical evidence.

*Id.* at § 22.2.8.

Fire investigators took eighteen samples from inside and outside the house and sent them to the lab for testing. Only the sample from the cement stoop outside the porch – where the owners kept their grill and frequently barbequed – tested positive for accelerant. The seventeen other samples, which included every sample taken from on the wooden porch or inside the house, tested negative for accelerant. (R. 2, Exhibits to Memorandum in Support of Petition for Habeas Corpus, Exhibit F, Laboratory Report at 1); (R. 18, Trial Transcript, Volume 2, at 37).

The remaining piece of evidence used by an expert to testify that a fire accelerant was used came from the testimony of "expert" Joan Tuttle. She said that the fact that the aluminum sills melted in windows and doors showed that the fire was arson: "aluminum melts at 1,220 degrees. Gives myself the opinion there had to be something on that floor area for that to reach those temperatures due to the fact that temperatures of a normal fire would be 900 to 1,000 degrees maximum on the floor area and that sill would not have burned." (R. 18, Trial Transcript, Volume 2, at 34-36).

This is simply wrong. "Wood and gasoline burn at essentially the same flame temperature." Fire Guide at § 6.8.2.2. Arson expert Dr. Gerald Hurst has explained that

any theory that the melting of aluminum confirmed that a fire was incendiary has been flatly contradicted: "[a] natural-wood fire can reach temperatures as high as two thousand degrees Fahrenheit – far hotter than the melting point for aluminum alloys, which ranges from a thousand to twelve hundred degrees." *See* David Grann, Trial By Fire, The New Yorker (September 7, 2009) (quoting Dr. Hurst, an acknowledged arson expert, who explains that many arson trials reach the wrong conclusions because so-called "experts" frequently give mistaken testimony).

In addition to the junk science nature of the prosecution's case, there was an absence of supporting evidence. There were no containers of fire accelerant found in or around the home, nor had Babick purchased any. As the District Attorney said, "[t]here is no evidence that connects Mr. Babick to accelerants." (App. 1). There were no witnesses to the starting of the fire and no reliable evidence of any incendiary device. The state has never offered a plausible theory as to where Babick or any arsonist would have obtained any accelerant. A neighbor testified that he kept some flammable liquids in his garage, but he and a police officer checked his property and could not find anything out of place or missing, nor any evidence of any cars being tampered with or siphoned. There is no explanation in the record as to where and how Babick – who was on foot and high on crack – obtained the large amounts of liquid accelerant he supposedly poured throughout the house.

The basic reason for the pattern of junk science that this case represents is the wrongful conduct of the Assistant State Attorney General handling the case after the local District Attorney refused to bring the case. The trial judge had ordered that the state rather than Calhoun County pay for an arson expert for Babick. The Assistant Attorney General advised Babick's counsel that his office would not pay for the expert and that "your only recourse is to sue the state of Michigan in the Court of Claims" for payment of the arson expert's fee. In light of this refusal, Babick's counsel gave up trying to get an arson expert and tried the case without any knowledge of the specious nature of the testimony of the state's expert witnesses. Counsel did little if anything to contest the dog testimony, the melting aluminum expert testimony, or the bogus burn

pattern testimony. I regard the refusal of the State's Attorney to pay for a defense expert as a clear due process violation, as did Magistrate Judge Carmody and Michigan Supreme Court Justice Kelly. Other members of the Michigan Supreme Court commented adversely on the conduct of the State's Attorney. *People v. Babick*, 610 N.W. 2d 916, *vacated in part*, 614 N.W.2d 588 (Mich. 2000). The conduct is a clear violation of a defendant's clearly established constitutional right of expert assistance to rebut the prosecution's expert testimony. *See Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).

I would reverse the District Court's decision on this ground and issue the writ of habeas corpus. I have not discussed the other grounds raised by Babick because the most fundamental ground is that he is probably completely innocent of arson and was unable to demonstrate his innocence because he had no expert to rebut the misguided testimony of the state's experts claiming that liquid accelerants caused the fire. Other grounds also contributed to error and have merit. His counsel could certainly have done more work to try to understand the faulty nature of the state's evidence and to go back to the trial judge to enforce Babick's right to an expert. Counsel was ineffective in these respects. *See Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) (finding counsel ineffective for doing nothing to determine if arson evidence was impeachable); *accord Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005) (finding counsel ineffective for failing to consult an arson expert or educate himself concerning the use of accelerants in arson cases).

In summary, there cannot be homicide by arson in this case without plausible expert evidence of the use of a liquid accelerant. There is none at all. If the lawyer for Babick had herself been knowledgeable about the science of arson or had not been denied the funds to employ an arson expert, she would have destroyed before the jury the erroneous testimony of the State's so-called experts. That should now be obvious. The refusal of the State to provide the funds for a defense expert — despite the trial judge's order to do so — and the consequent failure of trial counsel to understand the basics of the science of arson led directly to the conviction of Babick who, in my opinion, is probably innocent. Neither judges who have reviewed this case, nor the

lawyers who tried it or appealed it, nor the witnesses who testified are experts on arson. They are unfamiliar with the literature on arson or the science that has developed. So an egregious mistake has been made. This opinion is apparently the first time in this case that anyone dealing with the case has referred to the scientific standards concerning arson investigations and expert opinion found in the National Fire Protection Guide. This is like discussing the ethical rules that govern lawyers and judges without knowing of and referring to our Canons of Ethics or like trying to solve math problems without knowing the multiplication tables.

Babick has been in prison for fifteen years of a life sentence. I would require that he be released and give the state three months to try him after he has obtained adequate trial counsel.

Case 1:03-cv-00020-RHB-ESC  Doc #2  Filed 01/03/03  Page 26 of 105   Page ID#12



# Calhoun County
## PROSECUTING ATTORNEY

APPENDIX 1

Calhoun County Justice Center
161 E. Michigan Ave.
Battle Creek, MI 49017-4066
(616) 969-6980

December 4, 1995

JON R SAHLI
PROSECUTING ATTORNEY

JOHN A HALLACY
CHIEF ASSISTANT
PROSECUTING ATTORNEY

To:        Det. David Adams
           B.C.P.D.

From:      John A. Hallacy
           Chief Assistant Prosecuting Attorney

Re:        Andrew Frederick Babick Jr.
           Complaint No. 95-37718

After careful review of this warrant request, I must DENY the authorization of an arrest warrant. While there is evidence of motive and evidence that places Mr. Babick in the area at the time of the fire, the evidence "as a whole" is lacking. The following are some of the key weaknesses in the case:

1)    Credibility of witnesses: This case relies on the family of the suspect and person(s) dealing or allowing the dealing of cocaine out of 264 Grove Street.

2)    Accelerants: I do not argue that the burning of 264 Grove Street was an arson. But there is no evidence that connects Mr. Babick to accelerants. The only evidence that shows he had contact with accelerants is his footwear and this is weak evidence at best. There is no evidence nor explanation of where the charcoal lighter fluids or kerosenes came from.

3)    There is no direct or circumstantial evidence that places Mr. Babick inside 264 Grove Street a second time. Besides Holly Mony (who's statement about being inside and dropping a cigarette, I give little weight) we can place him on the porch and walking away "around" the time of the fire. The time frame of Mr. Babick being on the porch and walking away, varies greatly among the witnesses.

Case 1:03-cv-00020-RHB-ESC  Doc #2  Filed 01/03/03  Page 27 of 105  Page ID#113

4)    Dropping the cigarette: In our meeting on December 1, 1995 you put a great deal of weight on this evidence. I do not view this evidence as being very strong and I believe this evidence could work as much or more against us as for us.

I want to thank you for your work on this case.  You and Detective Huggett and the rest of the Battle Creek Police Department have done and outstanding job investigating this tragic incident.