RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LISA BERGMAN,

   *Petitioner-Appellant*,

 *v.*

            No. 21-2984

JEREMY HOWARD, Warden,

   *Respondent-Appellee*.

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:17-cv-13506—Matthew F. Leitman, District Judge.

Argued: July 21, 2022

Decided and Filed: December 12, 2022

Before: BATCHELDER, WHITE, and MURPHY, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Benton C. Martin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Detroit, Michigan, for Appellant. Jared D. Schultz, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Benton C. Martin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Detroit, Michigan, for Appellant. Jared D. Schultz, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

### OPINION

_____

MURPHY, Circuit Judge. In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held that the Due Process Clause requires states to provide psychiatric experts to indigent defendants who have a credible insanity defense. *Id.* at 74. Lisa Bergman relies on *Ake* to claim that she should have been provided an expert toxicologist at her criminal trial. The trial evidence

showed that Bergman drove into an oncoming truck and killed its occupants. Scientists testified that she had prescription drugs in her system at the time of this crash (and at the time of several prior accidents), and the state's expert opined that these drugs impaired her driving. A state court held that *Ake* did not require the state to provide Bergman with a defense toxicologist because she failed to show a sufficient need for one notwithstanding the state's expert evidence. Bergman now argues that the state court misread *Ake* and misunderstood the record. In this federal case, however, she must meet the stringent standards for relief in the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). Given the Supreme Court's lack of clarity over *Ake*'s scope, she has not done so. We affirm.

I

In the summer of 2013, Bergman lived with her mother in Port Huron, an eastern Michigan city that sits on the southernmost tip of Lake Huron. Around midnight on July 20, Bergman's ex-boyfriend, John Weis, visited her home to show his new puppy to her kids. Bergman had left some of her children's items at Weis's house and told him that she wanted to pick them up. Weis lived a few miles to the west in nearby Kimball Township.

It was a rainy and foggy night. Despite the inclement weather, Bergman decided to follow Weis to his home in her Ford F-350 sometime after 1:00 a.m. Although Weis could see Bergman's truck in his rearview mirror for part of the drive, he eventually lost sight of her and assumed that she had stopped at a gas station.

Bergman never made it to Weis's house. A concerned Weis went looking for her. He came upon the scene of a horrendous accident involving Bergman's F-350 and a much smaller truck. The two trucks had crashed into each other head-on and come to rest in a ditch. Their front ends had become entangled, and debris had flown everywhere. The impact killed the smaller truck's occupants, young men named Russell Ward and Koby Raymo. Bergman was awake but injured, and paramedics took her to the hospital.

After rendering aid, officers began to investigate the accident. While in the hospital, Bergman told an officer that she had accidentally driven past Weis's home and had turned around heading *eastbound* at the time of the accident. Other officers on the scene discovered

"gouge marks" "squarely" within the *westbound* side of the road. Bueche Tr., R.6-12, PageID 709, 710, 714. To the expert eye, these marks were "strong indicators" that the trucks had collided at this spot. Terpenning Tr., R.6-12, PageID 726. The impact would have caused the trucks to dip down and their parts to scratch the pavement. An accident-reconstruction expert thus had no doubt that Bergman's "big Ford pickup truck crossed the center line" at the time of the accident. *Id.*, PageID 727.

While searching Bergman's purse for her ID, an officer on the scene found a pint-size bottle of tequila that was a third full. The officer at the hospital obtained a blood sample from Bergman just before 5:00 a.m. Her blood-alcohol concentration came back under the legal limit at .04, which suggested that she might have had a "drink to a drink and a half in her system at the time of the blood draw." Glinn Tr., R.6-12, PageID 737, 746.

Yet other blood tests revealed prescription drugs in Bergman's system. She had taken oxycodone, an opiate designed for pain relief. She had also taken Soma, a muscle relaxer. And she had likely taken Adderall, an amphetamine that helps one's concentration. Although Bergman had ingested only "therapeutic" levels of these drugs, Soma and oxycodone were depressants that could have "additive effect[s]" when taken together and with alcohol. Glinn Tr., R.6-12, PageID 738–39.

An expert in forensic toxicology, Dr. Michele Glinn, believed that Bergman could not "operate a motor vehicle properly" when taking the drugs. *Id.*, PageID 742. Glinn's opinion did not rest solely on this tragic accident. It also rested on Bergman's long history of reckless driving. She had many (known) incidents of taking drugs, getting behind the wheel, and driving dangerously.

*January 2008 Incident*: Early on New Year's Day, officers saw a car "driving erratically." Bockhausen Tr., R.6-8, PageID 471. They pulled the car over and arrested Bergman, its driver, after smelling intoxicants and finding pills and marijuana in the car.

*March 17, 2012 Incident*: On St. Patrick's Day, a family was out shopping when a Jeep rear-ended their car and fled. An officer tracked down the Jeep and its driver, Bergman.

Bergman failed field sobriety tests, confessed to taking a muscle relaxer and an opiate, and had pills in her car. A blood test showed these drugs in her system.

*March 27, 2012 Incident*: Ten days later, a person called the police because a woman who turned out to be Bergman was "passed out" behind the wheel of a Jeep in a party store's parking lot. Singleton Tr., R.6-10, PageID 583. An officer woke up a dazed Bergman, who had her child in the backseat. She failed field sobriety tests and admitted to taking Soma and an opiate. A blood test revealed these drugs.

*May 2012 Incident*: Some six weeks later, several drivers called 911 because a car "couldn't stay in one lane" on the freeway. Boulier Tr., R.6-8, PageID 507. The officer who stopped this car found Bergman with pills. She again failed field sobriety tests, and a blood test again showed drugs in her system.

*August 2012 Incident*: Three months later, two men were heading home from a fishing trip with their boat in tow when Bergman rear-ended the boat. While waiting for the police, she passed out. At the hospital, Bergman said that she had also "blacked out" before the crash and confessed to taking prescription drugs. Mynsberge Tr., R.6-9, PageID 541. A blood test confirmed her confession.

*February 2013 Incident*: Six months later, Bergman rear-ended the car of a woman who was driving to pick up her daughter from a dance class. The woman, a substance-abuse counselor, told Bergman that she was "clearly intoxicated[.]" McKeever Tr., R.6-9, PageID 525–26. During field sobriety tests, Bergman could not recite the alphabet beyond "P." Phillips Tr., R.6-9, PageID 552. For a fifth time, a blood test showed that she had prescription drugs in her system.

*June 2013 Incident*: A month before the fatal crash, a driver on the freeway called 911 on a Jeep that was "all over the road" and that almost "lost control several times." Newcomb Tr., R.6-9, PageID 561–62. Bergman, the culprit, once again failed field sobriety tests. Among other things, she responded with "7" when asked to identify a number between "15" and "13." Hoffman Tr., R.6-9, PageID 567. An officer found pills in her car, and a blood test confirmed that she had taken the same drugs as before.

For the fatal accident, the state charged Bergman with six counts—three for each victim. It charged her with causing the death of Ward and Raymo by operating her truck with a suspended license. Mich. Comp. Laws § 257.904(4). It charged her with causing their death by operating her truck while intoxicated. *Id.* § 257.625(4). And it charged her with second-degree murder for both victims. *Id.* § 750.317. This murder charge required the state to establish that Bergman "knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of her actions." Instr., R.6-13, PageID 860. The state relied on her prior incidents to prove that she knew the risks of getting behind the wheel after taking prescription drugs. *See People v. Bergman*, 879 N.W.2d 278, 291–92 (Mich. Ct. App. 2015).

At trial, the prosecution called many scientists. Some described their methods to identify the pills confiscated during Bergman's encounters with the police. Others described their methods to test Bergman's blood for drugs or alcohol and the results of the tests. Dr. Glinn also testified as an expert toxicologist, describing the drugs in Bergman's system and opining about their dangerous effects on her driving.

Bergman's counsel had anticipated these scientific witnesses before trial. Counsel had accordingly moved the trial court to provide Bergman with a state-funded expert toxicologist. At a pretrial hearing, counsel requested this expert for two reasons. Counsel could not understand the results of Bergman's blood tests. A toxicologist could explain in plain English whether problems existed with the state's testing and whether the drugs found in Bergman's system would have impaired her driving. Alternatively, counsel asked for a toxicologist to confirm the state's test results by retesting the preserved blood samples from Bergman's driving incidents.

The trial court denied this motion. It categorically rejected the request for an expert to retest the samples. As the court saw things, Bergman's speculation that the state scientists might have conducted invalid tests did not warrant a new round of testing. Yet the court did not "rul[e] out [a] consultant-type expert" if defense counsel followed up with a clear explanation of what he needed the expert for. Mot. Tr., R.6-4, PageID 345. At this stage, however, the court found that counsel had not shown a sufficient need for a consultant. Counsel apparently never offered additional briefing on this topic.

After Bergman's lengthy trial, the jury deliberated for less than two hours.  It convicted her of all six counts.  The trial court sentenced her to an indefinite term of 25 to 50 years' imprisonment.

On appeal in state court, Bergman relied on *Ake* to argue that the trial court had violated due process by refusing to provide her with an expert toxicologist.  *Bergman*, 879 N.W.2d at 288–89.  The court disagreed.  *Id.*  It read *Ake* to require a state-funded expert only if a defendant shows "a nexus between the need for an expert and the facts of the case."  *Id.* at 289.  The court held that Bergman had not established this nexus because she did not adequately demonstrate why an expert would help the defense.  *Id.*  It reasoned that Bergman identified no grounds to believe that the state testing had been improper.  *Id.*  It added that Bergman did not explain how a defense expert could dispute Dr. Glinn's findings about the drugs in her system or their effects on her driving.  *Id.*

After the Michigan Supreme Court denied review, Bergman moved for federal relief under 28 U.S.C. § 2254.  Among other claims, she again argued that the trial court violated due process by denying her a state-funded expert toxicologist.  The district court agreed with Bergman that "fundamental fairness" required the state trial court to appoint a defense toxicologist at public expense to counter Dr. Glinn's testimony.  *Bergman v. Brewer*, 542 F. Supp. 3d 649, 661–62 (E.D. Mich. 2021).  The court nevertheless denied relief.  Under AEDPA, it explained, Bergman must prove that the state court's conclusion violated due-process principles that were "clearly established" by the Supreme Court.  *Id.* at 663 (citation omitted).  And the Supreme Court had yet to extend *Ake*'s holding to other types of experts.  *Id.*

Bergman moved for reconsideration.  She argued that the state court had also unreasonably determined the facts when holding that her counsel had not explained the need for an expert.  The district court disagreed because the state court's decision had been a legal determination, not a factual one.  *Bergman v. Brewer*, 2021 WL 4389277, at *3–5 (E.D. Mich. Sept. 24, 2021).

II

Bergman now renews her claim that the state trial court violated the Due Process Clause by denying her request for a state-funded toxicologist. The parties agree that AEDPA's standards govern this claim because the Michigan appellate court resolved it "on the merits[.]" 28 U.S.C. § 2254(d). We thus cannot grant relief unless Bergman shows one of two things. The Michigan court must have issued a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" *Id.* § 2254(d)(1). Or it must have issued "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2). Bergman suggests that the state court committed both errors. We will take her two legal arguments in turn, reviewing the district court's rejection of them de novo. *See Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017); *Miller v. Lafler*, 505 F. App'x 452, 456 (6th Cir. 2012).

*Issue 1: Did the state court unreasonably apply clearly established law?*

Bergman first suggests that the Michigan court's rejection of her due-process claim amounted to an "unreasonable application" of "clearly established" Supreme Court precedent. 28 U.S.C. § 2254(d)(1). She must clear a "high bar" to pass this test—a test that Congress intentionally made "difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (citations omitted).

Bergman initially must identify the "clearly established" legal principle on which she relies. To qualify as "clearly established," a principle must originate from an actual Supreme Court holding, not from its passing dicta. *See White v. Woodall*, 572 U.S. 415, 419 (2014). Bergman also must describe this holding with specificity. *See Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022). She cannot recite a holding at a "high level of generality" (for example, that a defendant must receive "adequate notice" of criminal charges) to expand the reach of an otherwise narrow ruling (for example, that the government may not convict a defendant of violating a statute that it did not charge). *Lopez v. Smith*, 574 U.S. 1, 6–8 (2014) (per curiam) (citation omitted).

Bergman next must show that the state court engaged in an "unreasonable application" of this principle. Under this test, a federal court's belief that a state court committed an error when applying a legal principle to the facts of a case does not suffice. Rather, we must be able to describe the state court's application as "objectively unreasonable[.]" *Woodall*, 572 U.S. at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). To warrant that description, a state court must have committed "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

These standards foreclose Bergman's claim. Our discussion of the "clearly established" law in this expert-witness area necessarily begins with *Ake*. There, Oklahoma charged Glen Burton Ake with capital murder. 470 U.S at 70, 72. Ake asked for a state-funded psychiatrist to help with his insanity defense. *Id.* at 72. The trial court denied this request, and an appellate court affirmed. *Id.* at 72–74. The Supreme Court reversed: "We hold that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Id.* at 74.

To reach this result, *Ake* invoked the due-process "balancing" test from *Mathews v. Eldridge*, 424 U.S. 319 (1976). When the government seeks to deprive a person of a liberty or property interest, the *Mathews* test requires a court to weigh the person's private interests at stake against the burdens on the government if it were to offer additional procedural protections before the deprivation. *Ake*, 470 U.S. at 77; *Mathews*, 424 U.S. at 335. To measure these interests, a court should consider the marginal increase in accurate decisionmaking if the court were to grant the additional procedural protection. *See Ake*, 470 U.S. at 77. It should also consider the degree of the risk of a wrong decision if the court were to deny that protection. *See id.* Applying this test, *Ake* reasoned that criminal defendants have substantial interests on the line because the prosecution seeks to deprive them of their liberty or even their lives. *Id.* at 78. It next held that the (unquantified) costs of requiring states to pay for a psychiatrist were not "substantial" when measured against these interests. *Id.* at 79. It lastly described a psychiatric expert as a "virtual necessity" for a defendant with a credible insanity defense, estimating that the lack of this expert

would create an "extremely high" risk of a wrong decision (a decision that an insane defendant was not insane). *Id.* at 81–83 (citation omitted).

*Ake*'s precise holding—that a state must provide an expert psychiatrist to an indigent defendant who makes a substantial showing of an insanity defense—does not directly control here. Bergman did not claim to be insane when she got behind the wheel of her F-350. She sought a toxicologist, not a psychiatrist. She wanted this expert to review the testing methods and results of the state's forensic scientists and to rebut Dr. Glinn's opinions about the effects of the drugs in her system on her driving. Did the Michigan court's refusal to provide this different type of state-funded expert qualify as an "unreasonable application" of *Ake*'s clearly established holding?

We think not. The Supreme Court has left open how *Ake* should extend to experts other than psychiatrists, *see Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985), and the Court's subsequent decisions have not created a "clear or consistent path for courts to follow" when answering this due-process question, *Lockyer*, 538 U.S. at 72. *Ake* relied on *Mathews* balancing to reach its result. 470 U.S. at 77–83. After *Ake*, however, the Court jettisoned this balancing test in this criminal context: "[T]he *Mathews* balancing test does not provide the appropriate framework for assessing the validity of state procedural rules which . . . are part of the criminal process." *Medina v. California*, 505 U.S. 437, 443 (1992). *Medina* opted instead for a historically rooted "narrower inquiry" that asked whether the failure to provide a procedural safeguard "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 445–46 (citation omitted). When adopting this alternative approach, *Medina* recognized that *Ake* had applied *Mathews* in a criminal case. *Id.* at 444–45. *Medina* opted not to "disturb[]" *Ake*'s holding because it was "not at all clear that *Mathews* was essential to the result[] reached" in that case. *Id.* at 444. Rather, it suggested that *Ake*'s bottom-line result (when gutted of nearly all of its reasoning) could "be understood as an expansion of earlier due process cases holding that an indigent criminal defendant is entitled to the minimum assistance necessary to assure him 'a fair opportunity to present his defense' and 'to participate meaningfully in [the] judicial proceeding.'" *Id.* at 444–45 (quoting *Ake*, 470 U.S. at 76).

How should a lower-court judge now decide whether due process requires a state to provide a defendant with other types of experts?  A fair reading of *Ake* would lead the judge to balance the private and public interests at stake with respect to this expert.  470 U.S. at 77.  But *Medina* would tell the judge not to engage in this balancing.  505 U.S. at 443.  It instead would require the judge to consider as a matter of "[h]istorical practice" whether states have long provided defendants with the type of expert at issue.  *Id.* at 446.  Or perhaps the judge should follow *Medina*'s dicta grounding *Ake* in the capacious language that a state must provide a defendant with the assistance necessary to assure the defendant "a fair opportunity to present his defense" and "to participate meaningfully in [the] judicial proceeding."  *Id.* at 444–45 (citation omitted).  Yet how should the judge then go about deciding what qualifies as a "fair" defense or a "meaningful" chance to litigate?  Both *Mathews*'s balancing test and *Medina*'s historical test are two specific (if divergent) ways to give substance to this general language.  If *Medina*'s dicta about *Ake* meant to hint at some third approach, the Court has yet to identify that alternative.  Until the Court provides more specific guidance on this topic, then, the law will remain "unclear" and state courts will have "broad discretion" to determine the circumstances when defendants have a right to state-funded non-psychiatric experts.  *Woodall*, 572 U.S. at 424 (citation omitted).

Caselaw confirms this uncertainty.  *See Carey v. Musladin*, 549 U.S. 70, 76 (2006).  We have previously noted that circuit courts "have not reached consensus" on whether "the right recognized in [*Ake*]—to a psychiatrist's assistance in support of an insanity defense—extends to non-psychiatric experts as well."  *Babick v. Berghuis*, 620 F.3d 571, 579 (6th Cir. 2010).  Some courts have suggested, at least prior to *Medina*, that *Ake*'s rules apply in the same way to other experts.  *See Little v. Armontrout*, 835 F.2d 1240, 1243–44 (8th Cir. 1987) (en banc).  Yet other courts have held that defendants must satisfy additional requirements, such as the requirement to demonstrate that the expert evidence is "both critical to the conviction and subject to varying expert opinion."  *United States v. Snarr*, 704 F.3d 368, 405 (5th Cir. 2013) (citation omitted).  We have ourselves sent mixed messages on this issue.  *Babick*, 620 F.3d at 579 (citing cases).  Perhaps for this reason, we have repeatedly denied certificates of appealability for claims like Bergman's on the ground that the Supreme Court has not clearly established when a defendant has a right "to a state-paid expert witness other than for a psychiatrist's assistance in support of

an insanity defense." *DeJonge v. Burton*, 2020 WL 2533574, at *5 (6th Cir. Apr. 20, 2020) (order); *Bullard v. Jackson*, 2018 WL 4735626, at *4 (6th Cir. Sept. 19, 2018) (order); *Davis v. Maclaren*, 2018 WL 4710071, at *3 (6th Cir. Apr. 3, 2018) (order); *McGowan v. Winn*, 2018 WL 1414902, at *2 (6th Cir. Mar. 21, 2018) (order).

In this case, moreover, the Michigan appellate court's logic—that Bergman failed to make an adequate showing to obtain a toxicologist—fits comfortably within the "leeway" given to the state courts as a result of the lack of clarity on how to apply *Ake*. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The Michigan court held that Bergman offered only speculation that the state scientists might have committed an error when testing her blood. *Cf. Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993). And it held that she failed to make a preliminary showing that another toxicologist might offer opinions different from Dr. Glinn's. *Cf. id.* Nor did Bergman need an expert as a "virtual necessity" to meaningfully present her defense that she had not been under the influence of drugs. *Ake*, 470 U.S. at 81–82 (citation omitted). Her counsel presented this defense in other ways. He, for example, got witnesses to testify that Bergman appeared normal before and after the crash. And he got witnesses to describe the wet and foggy conditions (which could have offered an alternative explanation for the accident). *Cf. United States v. Rodriguez-Felix*, 450 F.3d 1117, 1128 (10th Cir. 2006).

Bergman's responses do not change things. She quotes Supreme Court cases noting that the Constitution entitles defendants to the "basic tools" of their defense, *Britt v. North Carolina*, 404 U.S. 226, 227 (1971), or to a "meaningful opportunity" to participate in a case, *Little v. Streater*, 452 U.S. 1, 12, 16 (1981) (citation omitted); *see also Griffin v. Illinois*, 351 U.S. 12, 16, 17–20 (1956). By treating this broad language as the holding of these decisions, she asks us to do what the Supreme Court has told us not to: "transform" narrow decisions into broad ones by framing their holdings at "a high level of generality[.]" *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam); *see Davenport*, 142 S. Ct. at 1525. Unlike *Ake*, moreover, none of these decisions even addressed experts. *Britt* held that the Equal Protection Clause entitled an indigent criminal defendant to a state-funded "transcript of prior proceedings" when an "effective defense" required it. 404 U.S. at 227. *Griffin* held the same when an effective appeal required a transcript. 351 U.S. at 19–20. And *Little* held that due process entitled indigent defendants to

state-funded paternity tests in child-support actions. 452 U.S. at 9–17. These decisions do not "remotely" analyze the expert-witness question at issue in Bergman's case. *Lopez*, 574 U.S. at 6.

Conceding that *Medina*'s discussion of *Ake* was dicta, Bergman next cites our cases suggesting that lower courts should follow Supreme Court dicta. But the decisions on which she relies address only our *common-law* rules of precedent, which suggest that Supreme Court dicta might sometimes allow us to depart from our prior decisions. *See Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019); *see also United States v. Fields*, __ F.4th __, 2022 WL 17175576, at *16 n.13 (6th Cir. Nov. 23, 2022). These decisions say nothing about what qualifies as "clearly established" law within the meaning of 28 U.S.C. § 2254(d)(1). On that *statutory* front, the Supreme Court could not be clearer. Dicta does not count. *See Woodall*, 572 U.S. at 419.

Bergman lastly points out that some circuit decisions have already suggested that *Ake*'s holding should extend beyond psychiatrists to reach such other experts as pathologists or hypnotists. *See Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993) (per curiam); *Armontrout*, 835 F.2d at 1243. In *Terry*, for example, we indicated that a court should have provided an indigent defendant with an expert pathologist to rebut the government's evidence about the cause of a victim's death. *See* 985 F.2d at 284; *cf. Babick*, 620 F.3d at 579. In *Armontrout*, the Eighth Circuit similarly held that a court should have provided an indigent defendant with a hypnosis expert. *See* 835 F.2d at 1243. Bergman would have us "canvass" these decisions to conclude that her proposed rule of law—that indigent defendants are entitled to a state-funded toxicologist—"is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam). But AEDPA prohibits this approach. The Supreme Court has repeatedly warned that we may not use circuit decisions like the cases on which Bergman relies to "sharpen a general principle" from the Court "into a specific legal rule" that it has not clearly established. *Id.* If anything, Bergman's need to rely on circuit decisions like *Terry* all but confirms that the right she asserts has not been clearly established by the Supreme Court, and she must lose under § 2254(d)(1).

*Issue 2: Did the Michigan appellate court unreasonably determine the facts?*

Bergman falls back on the argument that the Michigan appellate court made an "unreasonable" factual finding when it rejected her due-process claim. 28 U.S.C. § 2254(d)(2). If true, this error would allow us to address the legal merits of that claim without giving deference to the state court's decision. *See Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011). What was the alleged factual error? When holding that Bergman failed to show a sufficient need for a defense toxicologist, the state court purportedly "ignored" or "overlooked" her counsel's explanations why she needed the expert. Appellant's Br. 40, 43. Yet this backup argument mistakes the *legal* question that the state appellate court resolved for a *factual* one that it did not.

To explain why, we start with a refresher on the different types of arguments that a state court might confront when resolving a constitutional claim. *Cf. Singh v. Rosen*, 984 F.3d 1142, 1148 (6th Cir. 2021). Consider a defendant's claim that counsel provided ineffective assistance in violation of the Sixth Amendment right to counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Sometimes, a defendant might raise a "purely legal" question about this right. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 965 (2018). For example, what legal test should govern whether a lawyer's failure to file a notice of appeal violates the Sixth Amendment? *See Roe v. Flores-Ortega*, 528 U.S. 470, 477–84 (2000). This type of question turns on the abstract meaning of the Constitution without respect to the particular facts of a specific case. So we would evaluate a state court's resolution of this pure question of law under § 2254(d)(1), which asks whether the resolution "was contrary to" "clearly established law[.]" 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); *cf. Vance v. Scutt*, 573 F. App'x 415, 420–21 (6th Cir. 2014).

Other times, a defendant might raise a "purely factual" question about the right to effective assistance. *See U.S. Bank*, 138 S. Ct. at 965. For example, did a defendant actually ask counsel to file a notice of appeal or did the defendant decline to appeal? *Cf. Cummings v. United States*, 84 F. App'x 603, 604–05 (6th Cir. 2003) (order). This type of question turns on the "basic, primary, or historical facts" about what happened in the real world without respect to the proper reading of the Constitution. *McMullan v. Booker*, 761 F.3d 662, 671 (6th Cir. 2014) (quoting *Thompson v. Keohane*, 516 U.S. 99, 110 (1995)). So we would evaluate a state court's

resolution of this question of fact under § 2254(d)(2), which asks whether the resolution "was based on an unreasonable determination of the facts[.]" 28 U.S.C. § 2254(d)(2); *Wood v. Allen*, 558 U.S. 290, 300–01 (2010); *cf. Thomas v. Neven*, 2021 WL 6103007, at *1 (9th Cir. Dec. 23, 2021) (mem.).

Yet defendants often raise neither a purely legal question nor a purely factual question about the right to effective assistance. *See U.S. Bank*, 138 S. Ct. at 965. Instead, they raise the question whether the "historical facts" about counsel's conduct violated the "legal test" for ineffective assistance. *Id.* at 966; *cf. Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1068–69 (2020). For example, did a case's record satisfy *Strickland*'s prejudice element by creating a reasonable probability that the defendant would have appealed but for counsel's bad advice? *See Neill v. United States*, 937 F.3d 671, 677–78 (6th Cir. 2019). The Supreme Court has interchangeably referred to this application-of-law-to-fact inquiry as a "mixed" or "ultimate" question. *See U.S. Bank*, 138 S. Ct. at 965; *Thompson*, 516 U.S. at 110–12; *Strickland*, 466 U.S. at 698.

Should we treat a state court's resolution of such a question as a legal determination subject to § 2254(d)(1) or a factual determination subject to § 2254(d)(2)? Both text and precedent show that this type of decision generally qualifies as a legal one subject to § 2254(d)(1). To begin with, the question falls squarely within 2254(d)(1)'s text. That text does not ask only whether a state court's decision was "contrary to" "clearly established" law; it also asks whether the decision was "an unreasonable application" of that law. 28 U.S.C. § 2254(d)(1). The provision thus gets triggered whenever a "state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case[.]" *Woodall*, 572 U.S. at 425 (citation omitted). In this way, the text tracks the Supreme Court's very definition of a mixed question: "the application of a legal standard to settled facts." *Guerrero-Lasprilla*, 140 S. Ct. at 1068.

Precedent points the same way. We have long explained that mixed questions fall within § 2254(d)(1) rather than § 2254(d)(2). *See Moore v. Mitchell*, 708 F.3d 760, 800 (6th Cir. 2013); *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003). This caselaw also comports with Supreme Court decisions in related contexts. The Court, for example, has often held that appellate courts

should review mixed questions about constitutional provisions (such as whether probable cause exists) under the de novo standard that governs legal issues. *See U.S. Bank*, 138 S. Ct. at 967 n.4. The Court has also held that a statute discussing "questions of law" (similar to § 2254(d)(1)) can reach mixed questions. *See Guerrero-Lasprilla*, 140 S. Ct. at 1068–72.

Turning to this case, Bergman herself concedes that her claim presents a "mixed" question about whether her attorney "presented adequate facts to show why an expert was needed" under the Michigan judiciary's sufficient-nexus test for *Ake* claims. Appellant's Br. 39. Just as a state court answers a mixed question governed by § 2254(d)(1) when it holds that counsel's conduct was not ineffective under *Strickland*, *see Barnes*, 339 F.3d at 501, so too the Michigan court here answered a mixed question subject to that provision when it held that counsel's explanation did not meet the nexus test under *Ake*, *see Bergman*, 879 N.W.2d at 289. Bergman argues that the court unreasonably applied this nexus test for various reasons—for example, because the court did not account for several factors that her counsel provided. Whether right or wrong, however, the court's ultimate application of the nexus test "ranked as a legal determination governed by § 2254(d)(1), not one of fact governed by § 2254(d)(2)." *Lopez*, 574 U.S. at 8.

To argue the contrary, Bergman relies on our *Rice* decision. That case considered a factual question about what a trial court decided. 660 F.3d at 254–57. The Michigan Supreme Court initially determined that the trial court had found that the prosecutor struck jurors for racially discriminatory reasons. *See Rice*, 660 F.3d at 247. After a remand, however, the Michigan Supreme Court inexplicably changed its mind by concluding that the trial court had rejected the race-discrimination claim. *See id.* at 254–55. We held that its second view of the trial court's decision was an unreasonable factual finding under § 2254(d)(2). *See id.* at 254–57. *Rice*, in other words, addressed a finding about the "basic, primary, or historical facts"—albeit *procedural* facts concerning the events that occurred in the trial court. *McMullan*, 761 F.3d at 671 (citation omitted). Here, by contrast, Bergman does not challenge a finding about a historical fact. Rather, she challenges the Michigan court's ultimate holding that Bergman "failed to establish the requisite nexus" under *Ake* "between the need for an expert and the facts of the case." *Bergman*, 879 N.W.2d at 289. This conclusion did not address "what happened."

*Keohane*, 516 U.S. at 110–11. Instead, it held that Bergman's arguments did not meet the legal test.

Bergman responds that the Michigan appellate court inaccurately described some *subsidiary* historical facts in the process of resolving this question. The court, for example, suggested that "she did not explain why she could not safely proceed to trial without her own expert" even though counsel did provide an explanation: he could not understand the test results. *Bergman*, 879 N.W.2d at 289. When read in context, however, the Michigan court was holding that counsel's explanation was *insufficient* to satisfy the legal test (not that he did not provide one at all as a matter of historical fact). Indeed, Bergman makes an argument that the Supreme Court has found summarily reversible. *See Lopez*, 574 U.S. at 8–9. In *Lopez*, the Ninth Circuit held that the state court's conclusion that the defendant had "adequate notice" of the charges against him was an unreasonable determination of the facts. *See id.* at 7. The Supreme Court rejected this view, noting that the Ninth Circuit wrongly treated a legal question as a factual one. *Id.* at 8. This reasoning covers Bergman's argument. *See also Miller*, 505 F. App'x at 457.

We end with one caveat. The Supreme Court has suggested that appellate courts might treat *some* fact-bound "mixed" or "ultimate" questions as factual rather than legal. *See U.S. Bank*, 138 S. Ct. at 966–68; *cf. Keohane*, 516 U.S. at 111. We do not foreclose that possibility. We hold only that Bergman's *Ake* question falls within § 2254(d)(1), not § 2254(d)(2).

We affirm.