RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0102p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

BARBARA JEAN MERCER,

      *Petitioner-Appellee/Cross-Appellant*,

    *v.*

ANTHONY STEWART, Warden,

      *Respondent-Appellant/Cross-Appellee*.

Nos. 24-1707/1751

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:16-cv-11331—Matthew F. Leitman, District Judge.

Argued: December 10, 2025

Decided and Filed: April 2, 2026

Before: BATCHELDER, GILMAN, and LARSEN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Scott R. Shimkus, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Anthony Stewart. Casey N. Swanson, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, for Barbara Mercer. **ON BRIEF:** Scott R. Shimkus, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Anthony Stewart. Casey N. Swanson, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Detroit, Michigan, David A. Koelzer, OFFICE OF THE FEDERAL COMMUNITY DEFENDER, Flint, Michigan, for Barbara Mercer.

─────────────

## OPINION

─────────────

LARSEN, Circuit Judge. A state jury convicted Barbara Jean Mercer of second-degree murder, tampering with evidence, and third-degree arson after police found two gunshot-riddled

bodies in a burning car. Mercer petitioned for habeas relief in federal court, arguing that the state court violated her due process rights when it failed to give a defense-of-others jury instruction, that her trial counsel provided ineffective assistance, and that the prosecutor committed misconduct in his closing statement. The district court granted Mercer habeas relief on the jury-instruction claim but denied relief on the rest. We REVERSE the district court's grant of habeas relief and AFFIRM the denial of relief on all other grounds.

I.

In 2011, a large "boom" drew the attention of a man living near a waterfowl refuge in Jackson County, Michigan. *People v. Mercer*, 2014 WL 4262998, at *1 (Mich. Ct. App. Aug. 28, 2014) (per curiam). When the man looked out his window, he saw a vehicle engulfed in flames and the taillights of another vehicle leaving the scene. He then called the police. When officers arrived, they discovered the charred remains of Anthony Hannah and Shemel Thomas in the scorched car. Both men had gunshot wounds to the head.

At the time, Barbara Mercer lived with her boyfriend Richard "Ricky" Janish, her young son, and her friend Jessica Campbell. Mercer and Campbell were unemployed and frequently smoked crack cocaine—mostly purchased from Hannah with cash or by exchanging sex or household items for the drug. Both Hannah and Thomas were considered mid-to-upper-level drug dealers in the area.

Two days prior to the discovery of Hannah's and Thomas's remains, Mercer had called Thomas and asked to buy $150 worth of crack cocaine. She told him she would give him a bag of DVD cases with the money inside. Campell drove Mercer to Thomas's house to make the purchase. But Mercer didn't have the money, so she left Thomas a bag of empty DVD cases in exchange for the drugs instead. As the two drove away, Thomas texted Mercer that he would "shoot up the house" if she did not give him the money. *Id*. Mercer deflected, replying that her ex-boyfriend had stolen the money, she had kids in the house, and she would not "pull that s---." *Id*. But she ultimately promised to get Thomas the money. Thomas replied, "dog just have my s---, real talk." *Id*.

Campbell and Mercer then went home and smoked all the crack cocaine. While they smoked, Mercer spoke with her boyfriend, Janish, on speaker phone and described the text message Thomas had sent. According to Campbell, Janish asked how they should handle the situation, and Mercer replied, "we should kill them, ha, ha, ha." *Id*. at *2. Campbell said that Mercer and Janish then discussed different ways of killing the drug dealers and burning the bodies in their car.[1] Campbell thought Janish seemed nervous about the threats.[2] But she did not take Mercer or Janish seriously at the time.

Several hours later, Thomas again texted Mercer asking, "When are you going to have my Cash? I'm not going to do s---. I must have my money." *Id*. Mercer said she would get back with him. Because it was Halloween, Mercer, Campbell, and Janish then took Mercer's son trick-or-treating.

While Campbell stayed out with Mercer's son, Mercer and Janish returned to the house. Hannah and Thomas also drove over to the house while Campbell was away. Unbeknownst to Cambell, Janish shot and killed both men during her absence.

When Campbell returned home later that evening, Janish was out back burning something in a barrel; the inside of the house smelled like bleach and was unusually clean; and the rug in Campbell's room was missing. Mercer explained that the rug had to be burned because Thomas had bled on it during a fight with Janish. Janish eventually left the house to work the second shift at a towing company. Campbell and Mercer stayed home and resumed smoking crack cocaine. But after Mercer phoned Janish to say she was feeling "paranoid," the two took Janish's advice to leave the house and check into a motel. *Id*.

The next day, Campbell saw news about the killings on television. That caused her to notice more evidence in the house, including red specks on the pillows and a bullet hole in the ceiling. Campbell then drove to her mother's house and called the police.

---

[1]Mercer, for her part, denied to police that she ever spoke with Janish and said that Campbell was the one who made statements about killing the victims. Janish likewise denied the planning but stated that Mercer and Campbell discussed "doing it." *Id*.

[2]Campbell's testimony on Mercer's mental state changed over time. She had previously stated that Mercer was "terrorized" by the threats but later testified that Mercer did not seem nervous about them. *Id*.

*Janish's Interview with Police*:  The police brought Mercer and Janish in for questioning. The interviews were recorded on DVDs that were admitted at trial.  Janish admitted to shooting both Hannah and Thomas but maintained that his intent had been only to "scare" the victims.  *Id*. at *3.  He also admitted that Mercer had called Hannah to get him to come over to the house. Ultimately, Janish admitted that he walked outside with a gun when the victims pulled into the driveway.  He first claimed that he did not know that the gun was loaded but later agreed that he had put a single round in the gun.  Hannah was sitting in the passenger-side front seat when Janish approached.  Janish recalled that Hannah stated, "I ain't got no problem with you."  *Id*. Janish then pointed the gun at Hannah, "clicked it" to "scare" Hannah, and the gun went "boom." *Id*.

After shooting Hannah, Janish entered the house, reloaded the gun, and walked to the bedroom where Thomas and Mercer were located.  He claimed that he saw Thomas try to "grab a hold of" Mercer and agreed with police that Thomas was trying to have sex with her.  *Id*. at *3. Janish said that he told Thomas to "get off of her," and he then pulled the trigger, killing Thomas.  *Id.*

Janish denied that Mercer had invited the victims over to the house to pay them for the crack cocaine with sex.  *Id*.  But he admitted that Mercer called them to come over to the house and that "she was fully aware" that Janish was going to "go out and scare them."  *Id*. at *4 (citation modified).

After Janish killed Thomas, he told Mercer to go buy some gas; a gas can was waiting in the car for that purpose.  Janish then drove the victims' car (and their dead bodies) to the wildlife preserve, with Mercer following.  Janish removed some cash and cocaine from the victims' car and then lit it on fire.  Janish agreed with police that he knew ahead of time that he was going to burn the bodies to "[g]et rid of the evidence."  *Id*.

*Mercer's Interviews with Police*: Investigators interviewed Mercer twice.  At her first interview, Mercer gave incomplete answers to many of the questions.  She stated that Janish was upset about the threatening text and said he would "take care of it" by scaring the victims.  *Id*. Mercer also admitted that she had called both Hannah and Thomas before the victims came over.

She also stated that Thomas came in through the front door, pushed her, and tried to have sex with her before Janish shot him.

At a second interview, Mercer again stated that Janish told her he would "'take care of' the problem" and that "he'd do it so they wouldn't come back." *Id*. She acknowledged that she owed the victims money and that she didn't have cash to pay them on the night they were killed. This time, Mercer stated that Thomas entered the home and was talking to her. She then explained that Janish shot Thomas when Thomas was standing next to her. She stated that Thomas said he forgot something, "and then he went to turn like this and then I—like elbow. It's not aggressively pushing me but he pushed me down and then that's when [Janish] had come—and he shot him." *Id*. at *5. She later admitted that she thought Thomas meant that he "forgot a rubber or something." *Id*. Mercer also admitted that she was "wearing a negligee" underneath her clothes and that she was "in the process of taking her pants off" when Thomas arrived. *Id*. at *11.

Mercer and Janish were each charged with (1) one count of conspiracy to commit first-degree premeditated murder; (2) two counts of first-degree premeditated murder; (3) one count of third-degree arson; and (4) one count of tampering with evidence in a criminal case.

*The Trial*: Mercer and Janish were tried together. Mercer was charged as a principal under an aiding-and-abetting theory. The prosecution's case relied primarily on Mercer's and Janish's statements to the police, as well as live witness testimony by Campbell. Janish's counsel put forth a theory that Janish had shot Hannah in self-defense and that he had shot Thomas to defend Mercer. Mercer's counsel echoed some of these themes, emphasizing the threatening nature of Thomas's texts and Mercer's intent solely to scare the victims. Mercer's defense counsel relied largely on evidence already admitted by the prosecution, as well as testimony by a detective who characterized Thomas and Hannah as "dangerous men." R. 7-8, Trial Tr., PageID 1173.

At the close of proofs, the trial court discussed the jury instructions with counsel.  For the Thomas killing, the court denied a defense-of-others instruction for both Janish and Mercer.[3] The trial court then asked, "[i]s there anything else anybody wants to add before we conclude?" R. 7-9, Trial Tr., PageID 1280.  Mercer's counsel stated, "I don't believe we had any other objections, your Honor." *Id*.

During closing arguments, the parties repeated themes from their opening statements. The prosecution continued to argue that Mercer and Janish planned the murders in advance, while the defense underscored Thomas's threats to Mercer and argued that there was no credible evidence of a conspiracy to kill.  On rebuttal, the prosecution sought to discredit Mercer's initial statement to the police that Thomas had started to rape her and Janish's initial statements to the police that downplayed his involvement.  The prosecutor told the jury that it need not believe these statements and that, under the hearsay rule, these self-serving statements were "inherently unbelievable."  R. 7-10, Trial Tr., PageID 1362–63.  Mercer's counsel objected that the prosecutor's statement didn't "accurately reflect . . . what hearsay is about." *Id*. at 1363.  But the trial court let the prosecutor continue with a warning that "[t]he hearsay rule is an extremely complicated rule of many parts." *Id.*

The court ultimately provided a self-defense instruction as to victim Hannah and instructed on the lesser-included offenses of second-degree murder and voluntary manslaughter as to both victims.  Mercer was convicted on two counts of second-degree murder, tampering with evidence, and third-degree arson.  The court sentenced Mercer to two terms of life imprisonment for her two second-degree murder convictions to run concurrently, six to ten years' imprisonment for tampering with evidence, and three to five years' imprisonment for arson.

---

[3]In the trial transcript, Janish's counsel references an in-chambers request for the defense-of-others instruction.  There was originally a question in state court whether Mercer's counsel requested the instruction alongside Janish's counsel.  But when Mercer's counsel testified in a *Ginther* hearing regarding ineffective assistance of counsel, he confirmed that he had joined Janish's counsel in the in-chambers request, and neither the judge nor the prosecutor took issue with the claim. *See Mercer v. Stewart*, 600 F. Supp. 3d 725, 741 n.3 (E.D. Mich. 2022).  Neither party contests this conclusion on appeal.

*Mercer's Post-Conviction Proceedings*: Mercer appealed, raising six issues, including a claim for the lack of a defense-of-others instruction, ineffective assistance of counsel, and prosecutorial misconduct in closing arguments. *See Mercer*, 2014 WL 4262998, at *5–7, *15. The state appellate court affirmed Mercer's convictions and sentences. *Id.* at *17. The Michigan Supreme Court denied leave to appeal in a standard form order. *See People v. Mercer*, 863 N.W.2d 329 (Mich. 2015) (mem.).

In 2016, Mercer filed a federal habeas petition raising the same issues she had presented on direct appeal. After several years of briefing, the district court granted habeas relief with respect to Mercer's conviction for Thomas's murder. The district court held that the state trial court had violated Mercer's due process right to present a defense when it declined to give a defense-of-others instruction. *Mercer v. Stewart*, 600 F. Supp. 3d 725, 782–83 (E.D. Mich. 2022). The court also granted a certificate of appealability on Mercer's claims based on (1) ineffective assistance of trial counsel, (2) prosecutorial misconduct in the closing statement, (3) the state trial court's sentencing based on a conclusion that Mercer and Janish planned to kill Thomas and Hannah in advance,[4] and (4) its own order denying relief from her sentence for the murder of Hannah. Mercer and the Warden now cross-appeal the district court's decision. We reverse the district court's grant of habeas relief as to the jury-instruction claim and affirm the denial of habeas relief on all other grounds.

II.

The Antiterrorism and Effective Death Penalty Act (AEDPA) governs Mercer's case. This statute "erects a formidable barrier to federal habeas relief for prisoners whose claims," like Mercer's, "have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011). It requires Mercer to clear several procedural barriers and, if successful, to pass through one of two gateways to relief. *See* 28 U.S.C. § 2254(d).

---

[4]Mercer waives this issue on appeal by failing to address it in her briefs. *See Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010).

Passing through the first gateway, found in § 2254(d)(1), would require Mercer to show that the state adjudication of her claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." That's a "high bar" that "Congress intentionally made difficult to meet." *Bergman v. Howard*, 54 F.4th 950, 957 (6th Cir. 2022) (citation omitted). The petitioner must first "identify the 'clearly established' legal principle on which she relies." *Id.* The principle "must originate from an actual Supreme Court holding, not from its passing dicta" and be "describe[d] . . . with specificity." *Id.* And the holding cannot be at a "high level of generality" because that would allow the petitioner to "expand the reach of an otherwise narrow ruling." *Id.* (citation modified). If the petitioner successfully states a principle at the appropriate level of specificity, she must show more than merely an objectionable decision; the state must have committed "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Passing through the second gateway, found in § 2254(d)(2), would require Mercer to show that the state adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." This too is a "highly deferential standard." *Carter v. Bogan*, 900 F.3d 754, 768 (6th Cir. 2018). Mercer must show that the record "compel[s] the conclusion that the state court had no permissible alternative but to arrive at the contrary conclusion." *Id.* (citation modified). Mere disagreement with the state court's factual determination is not enough. *Id*.

In reviewing claims under § 2254(d), we consider the district court's legal conclusions de novo, and we presume a state court's factual determinations are correct unless the petitioner rebuts this presumption by clear and convincing evidence. *Davis v. Lafler*, 658 F.3d 525, 530-31 (6th Cir. 2011) (en banc).

III.

The district court concluded that the state court violated Mercer's constitutional rights by failing to give a defense-of-others instruction with respect to Thomas's killing.[5]  But AEDPA bars this claim.  Contrary to the district court's conclusion, Mercer's claim presents a mixed question of law and fact that falls under § 2254(d)(1), not under § 2254(d)(2).  Once Mercer's claim is appropriately categorized, this court's precedent confirms—and Mercer concedes—there is no viable legal theory for relief under subsection (d)(1), so her claim fails.  *See Keahey v. Marquis*, 978 F.3d 474 (6th Cir. 2020).

A.

Michigan law requires a court to provide a defense-of-others jury instructions only in certain circumstances.  The Michigan Self Defense Act permits an individual to use deadly force against another if the person "honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm . . . [or] the imminent sexual assault of himself or herself or of another individual."  Mich. Comp. Laws Ann. § 780.972(1).  Michigan courts have determined that the "reasonableness of a person's belief regarding the necessity of deadly force depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *People v. Guajardo*, 832 N.W.2d 409, 417 (Mich. Ct. App. 2013) (citation omitted).  And "the defendant has the burden of producing 'some evidence from which the jury can conclude that the essential elements of [the defense] are present.'" *People v. Leffew*, 975 N.W.2d 896, 907 (Mich. 2022) (alteration in original) (quoting *People v. Lemons*, 562 N.W.2d 447, 453 (Mich. 1997)).  The burden is "not a heavy one." *Id.*  But unless there is "sufficient evidence" to warrant a jury finding of a defense, "the trial court is not required to instruct the jury on that defense." *Lemons*, 562 N.W.2d at 454.

---

[5]Below, the parties and the district court also addressed procedural default.  The state appellate court determined that Mercer waived her jury-instruction claim at trial.  Such waivers usually constitute procedural default in habeas.  *See Mercer*, 2014 WL 4262998, at *7; *Shahideh v. McKee*, 488 F. App'x 963, 965 (6th Cir. 2012) (per curiam).  Yet despite Mercer's apparent default, the state affirmatively "concede[d]" in its answer that "procedural default . . . do[es] not apply to this case."  R. 9, Ans., PageID 1858.  The district court deemed the procedural-default defense waived and allowed Mercer to proceed to the merits.  The Warden does not challenge this ruling, and we decline to address it further. *See Maslonka v. Hoffner,* 900 F.3d 269, 276–77 (6th Cir. 2018).

Here, the Michigan Court of Appeals concluded that "the trial court did not abuse its discretion in declining to provide the defense of others instruction." *Mercer*, 2014 WL 4262998, at *9. To reach that conclusion, the court first laid out the facts, including details about Thomas's threatening comments, Janish's statement that he saw Thomas try to "grab a hold of" Mercer, his statement that he told Thomas to "'get off'" of her, and Mercer's initial statement that Thomas tried to have sex with her. *Id.* at *4, *8. The court defined the issue as whether the defense-of-others "jury instruction [was] applicable to the facts of [Mercer's] case." *Id.* at *7 (citation omitted). The court then determined that "[t]here was no evidence that Janish acted out of fear that defendant was in imminent danger." *Id.* at *8 (citation omitted). So the jury instruction was not required. In other words, the state court looked at the record evidence and, applying the legal standard to it, asked whether Mercer had presented "some" or "sufficient evidence," *Lemons*, 562 N.W.2d at 454, "from which the jury could conclude that all the essential elements of the defense were present," *Leffew*, 975 N.W.2d at 907 (citation modified). The court concluded that the trial court had not abused its discretion by concluding that Mercer's evidence did not suffice. *Mercer*, 2014 WL 4262998 at *9.

That sort of reasoning—applying a legal standard to a set of historical facts—presents a "mixed question" of fact and law. *Bergman*, 54 F.4th at 962. And we have held that, in the AEDPA context, that sort of "mixed question[] fall[s] within § 2254(d)(1) rather than § 2254(d)(2)." *Id.*; *but see id.* at 963 (holding open the possibility that "appellate courts might treat *some* fact-bound 'mixed' or 'ultimate' questions as factual rather than legal" in other contexts). That conclusion, we explained, follows straight from the text of subsection (d)(1), which asks, in part, whether the state court "decision was 'an *unreasonable application*'" of "clearly established" law. *Id.* at 962 (emphasis added). And it also comports with our long-established precedent, *see id.* (citing *Moore v. Mitchell*, 708 F.3d 760, 800 (6th Cir. 2013), and *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003)), as well as Supreme Court decisions in related contexts, *id.* (citing *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 n.4 (2018), and *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 227–33 (2020)).

What's more, we have held that the precise question here—"whether to provide a jury instruction" based on a particular set of facts—"is not the kind of fact-based determination subject to scrutiny under § 2254(d)(2)." *McMullan v. Booker*, 761 F.3d 662, 671 (6th Cir. 2014). And that makes sense.  Whether a particular set of historical facts (e.g., that Thomas had sent threatening messages and that Janish told Thomas to "get off" Mercer) constitutes "some evidence" sufficient to permit the inference of an ultimate fact (that Janish had drawn a reasonable and honest conclusion about Mercer's peril) is a legal or "mixed" question, not a purely factual one.  It does not ask "what happened?"  *Bergman*, 54 F.4th at 963 (citation omitted).  It instead accepts what happened and asks whether those facts would help support a "jury . . . conclus[ion] that the essential elements of [the defense] are present."  *Leffew*, 975 N.W.2d at 907 (second alteration in original) (citation omitted).  And in an AEDPA case, legal (and "law-application") questions are analyzed under § 2254(d)(1).  *Bergman*, 54 F.4th at 962.  So we must evaluate Mercer's claim under subsection (d)(1).

The district court reached a contrary conclusion.  It acknowledged that "[a] trial court's *ultimate* 'decision about whether to provide a jury instruction is not the kind of fact-based determination subject to scrutiny under Section 2254(d)(2).'"  *Mercer*, 600 F. Supp. 3d at 754 (quoting *McMullan*, 761 F.3d at 671).  But, relying on Ninth Circuit caselaw, the district court determined that "[a] federal court reviewing a state court conclusion on a mixed issue . . . 'must first separate the legal conclusions from the factual determinations that underlie it.'"  *Id.* (quoting *Lambert v Blodgett*, 393 F.3d 943, 977–78 (9th Cir. 2004)).  And, having done that, the federal court should review the underlying factual determinations under § 2254(d)(2).  *Id.*  Even if this is the correct legal framework (we do not decide), the district court erred by treating the state court's conclusion "that there was 'no evidence' that Janish killed Thomas to protect Mercer from a sexual assault" as a "factual determination."  *Id.* at 752.

The Michigan appellate court's determination cannot be fairly read, as the district court did, to say that there was literally *no* (that is, zero) evidence that Janish acted out of a reasonable and honest belief that Mercer was in imminent danger of sexual assault or great bodily harm. *See Mercer*, 600 F. Supp. 3d at 735.  Far from "ignor[ing]" the record evidence, *id.* at 754 n.10, the state appellate court directly addressed the facts that Mercer raised in her brief on direct

appeal.   Mercer argued that the jury should have been given a defense-of-others instruction because there was "evidence" that Janish "reasonably believed that . . . Mercer was in danger." R. 7-15, Mercer Brief, PageID 1531.  To support her argument, she pointed to the "threats" from "dangerous men," as well as an expert's testimony that drug-dealer threats should be taken seriously. *Id.* 1531–32.  She referenced Janish's testimony that he believed that Thomas was attacking Mercer.  And she emphasized the fact that Thomas was present in Mercer and Janish's own home.

The state appellate court addressed this evidence.  In the fact section, the court recited the content of Thomas's threats to Mercer. *Mercer*, 2014 WL 4262998, at *1.  It described Thomas and Hannah as "'mid-to-upper level' drug dealers with a history of prior convictions."[6] *Id*.  And it noted that Janish knew of the threats and that he had said that he "saw Thomas try to 'grab a hold of' [Mercer] . . . [and] told Thomas to 'get off of her'" before shooting. *Id.* at *3.  The court also included Mercer's initial statement to the police that "Thomas showed up at her house, came in through the front door, pushed her, and tried to have sex with her before Janish shot him." *Id.* at *4.  Finally, the court noted that Mercer and Janish lived together and that Mercer had invited Thomas to their home. *Id.* at *1.  Then, in its analysis section, the court explained why it thought that these facts were not enough to justify the instruction: Thomas was an unarmed invitee; Mercer later stated that Thomas "pushed her onto the bed in a non-aggressive manner"; and the threats were too remote in time to justify the use of deadly force. *Id.* at *7–9.

So, this is not a case like *Brumfield v. Cain*, 576 U.S. 305 (2015), or *Wofford v. Woods*, 969 F.3d 685 (6th Cir. 2020), in which the state court just ignored the petitioner's evidence in the record.  Instead, the state court's opinion reveals that it looked at the record evidence Mercer presented in her state-court briefing.  And it determined that these historical facts did not constitute "some evidence from which the jury c[ould] conclude that the essential elements of the defense are present." *Leffew*, 975 N.W.2d at 907 (citation modified).  Perhaps the court was inartful in phrasing this conclusion as it did—that "[t]here was no evidence that Janish acted

---

[6]Although the state court did not mention the expert opinion that threats from drug dealers should be taken seriously, a state court "need not make detailed findings addressing all the evidence before it." *Klein v. Martin*, 146 S. Ct. 589, 596 (2026) (per curiam) (citation omitted).

out of fear that defendant was in imminent danger." *Mercer*, 2014 WL 4262998, at *8. But we "have no authority to impose mandatory opinion-writing standards on state courts." *Klein*, 146 S. Ct. at 596 (citation modified). Instead, AEDPA "require[s] federal courts to give the 'benefit of the doubt' to merits decisions issued by the courts of the sovereign States." *Id.* (citation omitted). Perhaps too the state court's ultimate conclusion was in error; perhaps the evidence Mercer presented was sufficient to require the instruction under Michigan law.[7] But if that is so, it was an error of law (or law application), not of fact. Errors of that sort must be analyzed under § 2254(d)(1). *Bergman*, 54 F.4th at 962.

B.

When analyzed under § 2254(d)(1), this case is straightforward. Mercer conceded below and on appeal that our decision in "*Keahey . . .* eliminated 28 U.S.C. § 2254(d)(1) as a viable legal theory" in her case. Petitioner Br. at 33. That concession decides the issue; but a brief review of *Keahey* shows why. In *Keahey*, a state court denied the defendant's requested self-defense instruction during his criminal trial. 978 F.3d at 476. After his conviction for attempted murder, the defendant filed a habeas petition, arguing that the denial of the instruction violated his due process rights. *Id*. We concluded that the Supreme Court had never clearly established a constitutional right to a self-defense instruction; so, the defendant had no basis for habeas relief under § 2254(d)(1). *Id*. at 479. *Keahey* reasoned that although the Supreme Court has "establishe[d] a narrow category of state jury-instruction mistakes that violate the clearly established right to 'fundamental fairness,'" *id*. at 478 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)), it "has never invoked this principle in granting relief for the failure to give a self-defense instruction," *id*. Thus, the defendant could not show "that the state appellate court's decision was 'contrary to' clearly established Supreme Court precedent." *Id.*

---

[7]To be clear, we do not decide here the quantum of evidence needed to meet the "some evidence" standard under Michigan law, though we note that the Michigan Supreme Court has said that the defendant's burden is "not a heavy one." *Leffew*, 975 N.W.2d at 907. We need not decide how light the burden is, or whether Mercer carried it. Even if the state court erred in its application of state evidentiary rules, that would not entitle Mercer to federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law." (citation modified)).

*Keahey* further held that a state court's failure to provide self-defense jury instructions cannot create an unreasonable application of federal law. *Id*. at 479. The Supreme Court has held that a criminal defendant is guaranteed the opportunity to present a defense and that a trial must comport with fundamental fairness, but "state courts [have] considerable 'leeway' when deciding whether to submit the charge to the jury." *Id*. (citation omitted). What's more, *Gilmore v. Taylor* rejected the idea that "the right to present a defense includes the right to have the jury consider it" because "such an expansive reading of our cases would make a nullity of the rule . . . that instructional errors of state law generally may not form the basis for federal habeas relief." 508 U.S. 333, 344 (1993); *Keahey*, 978 F.3d at 479. Mercer thus has no claim for relief under § 2254(d)(1).

C.

One more point. After mistakenly concluding that Mercer had satisfied § 2254(d)(2), the district court analyzed Mercer's claim de novo. *Mercer*, 600 F. Supp. 3d at 757 (citing *Rice v. White*, 660 F.3d 242, 257 (6th Cir. 2011)). Then, the court concluded that the Due Process Clause creates a federal right to a defense-of-others instruction and found that the right was violated here. *Id.* at 757–66. Acknowledging that neither this court nor the Supreme Court has recognized such a right, *see Keahey,* 978 F.3d at 480, the district court grounded its holding in the law of two other circuits and three states. *See Mercer*, 600 F. Supp. 3d at 758 (collecting cases).

It is true that a petitioner who passes through the § 2254(d)(2) gateway is entitled to de novo review. *See Rice*, 660 F.3d at 257. But de novo review just means that courts need not afford statutory AEDPA deference to the state court's adjudication. It does not allow federal courts to set aside other habeas principles. Relevant here, federal courts cannot announce and retroactively apply new procedural rules in habeas. *Teague v. Lane*, 489 U.S. 288, 310 (1989); *see also Edwards v. Vannoy*, 593 U.S. 255, 263 (2021). And, to show a cognizable federal claim for habeas purposes, a petitioner must satisfy both AEDPA and *Teague*. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (per curiam) ("[I]f [the Supreme Court's] post-AEDPA cases suggest anything about AEDPA's relationship to *Teague*, it is that the AEDPA and *Teague* inquiries are distinct.").

Of course, a claim that has satisfied § 2254(d)(1)'s more demanding standard will usually have satisfied *Teague* as well. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000). But a finding that a state court unreasonably determined the *facts* under § 2254(d)(2) does not remove the *Teague* bar. Instead, the petitioner must still show that the *legal* rule it invokes is an "old" rule—that is, one "*dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (emphasis in the original).

The district court did not analyze whether a federal right to a defense-of-others instruction was dictated by existing precedent within the meaning of *Teague*. In fairness, the Warden did not squarely ask it to—though he did nod in that direction by arguing that such a right was "not cognizable in habeas." R. 9, Ans., PageID 1876; Respondent Br. at 22 (citing *Estelle*, 502 U.S. at 71–72)*; see also Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) ("[A] federal court may, but need not, decline to apply *Teague* if the State does not argue it."). We do not decide the *Teague* question here either. We simply remind the parties and the district court that "de novo review" under AEDPA simply means "without deference to the state court's decision." The other habeas rules still apply.

In any case, Mercer's claim fails under AEDPA. And because we reverse the district court's grant of habeas relief, we do not reach the lower court's choice of remedy.

## IV.

We turn now to Mercer's ineffective assistance of counsel claim. Mercer pins her claim on her counsel's mistaken reliance on a duress defense. But Mercer fails to pass the "doubly deferential gauntlet" that all ineffective assistance of counsel claims must face on habeas review. *White v. Plappert*, 131 F.4th 465, 479 (6th Cir. 2025). That is, she fails to show that *every* fair-minded jurist would disagree with the state court's determination that her counsel's errors did not affect the outcome of the proceeding. *See Strickland v. Washington*, 466 U.S. 668, 688, 691–92 (1984); *Harrington*, 562 U.S. at 101. "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

A review of the state proceeding helps situate Mercer's claim. During voir dire, Mercer's defense counsel told the jurors that the court would likely instruct them on the defense of duress.

He again mentioned duress in his opening statement.  Soon after, Mercer's defense counsel, and the judge, learned from the prosecutor that, in Michigan, a duress defense is unavailable as a matter of law in homicide cases.  The judge told the attorneys, "I'm going to have [the duress instruction] pulled out of each one of their [jury-instruction] books at this time and we'll address it, change it and modify it for the final instructions."  R. 7-7, Trial Tr., PageID 761.  Mercer's counsel did not mention duress to the jury again.

> During the prosecutor's closing argument, he told the jury:
>
> Now there are some issues that came up during the trial that the Judge will instruct you on.  And one of the things I want to make sure you understand is that all of the attorneys in this case at the very beginning of this case and that includes the Judge, made a legal mistake.  And that was initially advising you that duress was part of this case.  One of the things the Judge is going to tell you is that all of us, I, [both defense counsel], and the Judge himself mistakenly told you that duress was a defense in this case.
>
> It is not.  It never has been.  And the Judge is going to instruct you that you cannot consider duress as part of your—part of your discussions in this case.  It is an invalid defense in the context of this case.

R. 7-10, Trial Tr. PageID 1370.

The trial court also issued a correction in the final instructions, saying, "Now at the . . . beginning of this trial I gave you a preliminary instruction about the defense of duress.  I now inform you and instruct you that instruction was inapplicable in the context of this case.  You are not to consider duress in your deliberations in any form."  *Id*. at 1385.

Mercer argues that her counsel's "mistake of black-letter law" with respect to the duress defense constituted deficient performance and that the error caused prejudice because her attorney lost all credibility with the jury.  Petitioner Br. at 10.  But Mercer cannot show harm under AEDPA.  True, Mercer's counsel—along with the prosecutor and the judge—mistakenly thought at the outset that a duress defense would be available.  *See Mercer*, 2014 WL 4262998, at *14.  That was error.  But Mercer cannot show a reasonable probability that, without this initial error, she would have been acquitted.

First, Mercer's counsel presented a different, legitimate, defense throughout the case. Her counsel emphasized in both his opening and closing statements that Mercer and Janish intended only to scare the victims. And he continued to emphasize that Mercer was surprised when Janish killed the victims. The state court did not unreasonably determine that Mercer's counsel employed a valid defense strategy. Mercer's counsel sought to show that Mercer could not be guilty of murder or conspiracy to murder because she did not have the requisite mental state—a strategy that Mercer admits was valid. *See* Petitioner Br. at 10 (noting that "trial counsel did argue what amounts to a legitimate defense").

Second, the state court did not unreasonably determine that the shared error did not cause Mercer's counsel to lose all credibility. Mercer argues that counsel had "no chance with the jury by the time [counsel] attempted to pivot to a legitimate defense." Petitioner Br. at 11. But her counsel did not suffer any unique loss of credibility from the mistake because the prosecutor specifically stated that both he and the court were equally at fault. And the court's corrective instruction remedied whatever prejudice remained after defense counsel stopped promoting that theory of the case. Despite Mercer's contention that the instructions did "next-to-nothing" to cure the prejudice, Petitioner Br. at 15, we routinely expect juries to "follow the law" when the court issues an "ameliorative" instruction. *See Thompson v. Rapelje*, 839 F.3d 481, 485 (6th Cir. 2016).

Mercer argues that *English v. Romanowski*, 602 F.3d 714 (6th Cir. 2010), should move the needle toward prejudice, but *English* doesn't change the result here. In *English*, trial counsel promised the jury it would hear specific testimony from a witness whom counsel later decided not to call. *Id.* at 719. The court determined that counsel should have fully investigated the witness prior to opening statements rather than create "unfulfilled promise[s]" for the jury. *Id.* at 729. But here the court's and the prosecutor's shared blame in Mercer's case is quite different from the defense counsel's poor decision in *English*. In fact, the court in *English* never addressed the error at trial, whereas here the court and the prosecutor made explicit statements to the jury accepting shared blame for initially mentioning an inapplicable defense. "The Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Mercer cannot show that every fair-minded jurist would

disagree with the state court's conclusion that Mercer was not constitutionally prejudiced by her counsel's mention of the duress defense.

V.

Mercer's prosecutorial misconduct claim equally fails. "A prosecutor's improper comments will be held to violate the Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 44 (2012) (per curiam) (citation modified). This standard is "very general," and state courts should be given considerable leeway in resolving such claims on a case-by-case basis. *Id.* at 48. A state decision "cannot [be] set aside . . . on a prosecutorial-misconduct claim unless a petitioner cites other Supreme Court precedent that shows the state court's determination in a particular factual context was unreasonable." *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015) (citing *Parker*, 567 U.S. at 48). Given the considerable leeway afforded to state court decisions, Mercer cannot show the state court's decision here was an unreasonable application of clearly established federal law.

To be sure, the prosecutor made incorrect statements about hearsay in his closing rebuttal. He stated:

> [Y]ou've all heard about hearsay . . . . [T]here's a number of exceptions to the hearsay rule. [The exceptions are] based on the concept that if a defendant says something that hurts him it's inherently believable and therefore it's admissible . . . . If they say something that favors them it's inherently unbelievable and it's . . . barred by hearsay.

R. 7-10, Trial Tr., PageID 1362–63. The Michigan appellate court found that the prosecutor "acted inappropriately when he argued that admissions of a party opponent were 'inherently believable.'" *Mercer*, 2014 WL 4262998, at *15.

Even so, the Michigan appellate court's conclusion that the prosecutor's statements did not infect the whole trial was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (citation modified).

The Michigan appellate court came to this conclusion because it found that the prosecutor's statements were "isolated" and part of the prosecutor's larger remarks about witness credibility—a legitimate area for prosecutorial comment. *Mercer*, 2014 WL 4262998, at *15 (citing *People v. Buckley*, 378 N.W.2d 432 (1985)). The state court was correct in determining that a prosecutor's statements will not constitute misconduct if they can be read "[i]n context" as "part of a broader [legal] argument." *Parker*, 567 U.S. at 47. And Mercer points to no Supreme Court precedent that contradicts this point, as would be required under AEDPA. *Id.* at 48.

The Michigan appellate court also found that the judge issued curative instructions when he told the jury that the "hearsay rule was 'extremely complicated' with many parts," that the statements and arguments of lawyers "are not evidence," that "the jury was to determine what each piece of evidence means," and that "the jury was to give defendants' statements 'whatever weight you think the statements deserve.'" *Mercer*, 2014 WL 4262998, at *15. Curative instructions can help prevent a denial of due process in this context. For instance, in *Darden v. Wainwright*, 477 U.S. 168, 182 (1986), the Supreme Court found that a prosecutor's comments did not result in the denial of due process when the "trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence." Given that the trial judge's instructions mirror the ones found in *Darden*, we fail to see how the state court's conclusion is unreasonable.

What's more, as the district court noted below, the jury must not have believed the prosecutor's misstatement of the law because the jury failed to convict Mercer of first-degree murder. *See Mercer*, 600 F.Supp. 3d at 777. The main evidence supporting the jury's conclusion was the out-of-court statements by both defendants that they did not plan to kill either victim in advance. *Id.* ("[T]he jury's verdicts were, in large measure, *consistent* with the portions of the statements by Mercer and Janish that the prosecutor sought to discredit through his misstatement of the law."). If the jury believed the prosecutor, they would have likely believed Campbell's testimony indicating that there was a conspiracy rather than Mercer's testimony that she did not plan to kill.

Mercer's reliance on *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and *Darden*, 477 U.S. at 168, doesn't change this result. Neither case authorizes us, in a situation like this,

to override a state court's decision based on the "very general" standard for prosecutorial discretion that provides considerable "leeway" for case-by-case determinations. *Parker*, 567 U.S. at 48 (citation modified).

In *Donnelly*, the prosecutor stated in his closing argument that "I honestly and sincerely believe that there is no doubt in this case, none whatsoever," that the defendant is guilty. 416 U.S. at 640 n.6. But the Supreme Court found that the "context" of a prosecutor's comments did not render the entire trial unfair even after the prosecutor gave "a personal opinion as to guilt." *Id.* at 639–40. It reasoned that "closing arguments of counsel[] are seldom carefully constructed" and that the judge's curative instructions were sufficient. *Id.* at 645–46.

*Darden* merely confirms the *Donnelly* analysis. In *Darden*, a prosecutor wished for the defendant's death and disfigurement in increasingly brutal terms. 477 U.S. at 179–80; *see also Stewart v. Trierweiler*, 867 F.3d 633, 639 (6th Cir. 2017) (describing *Darden*). Even so, the Supreme Court declined to find that the petitioner's conviction violated due process. *Darden*, 477 U.S. at 181. The Court examined the context, including the judge's instructions, as discussed above, and found that "Darden's trial was not perfect—few are—but neither was it fundamentally unfair." *Id.* at 183 (citation omitted). *Darden* and *Donnelly* present arguably worse instances of prosecutorial misconduct than that presented here. Given that the Supreme Court did not find misconduct in either case, we cannot say that the state court acted unreasonably in concluding that Mercer's claim likewise fails.

\* \* \*

For the reasons set forth above, we REVERSE the district court's grant of habeas relief on the jury-instruction claim and AFFIRM the denial of relief on all other grounds.